**CLIFFORD JACOBS MOTORS, INC.,**
Plaintiff,

v.

**CHRYSLER CORPORATION and Chrysler Motors Corporation, Defendants.**

**Civ. A. No. 8695.**

United States District Court,
S. D. Ohio, W. D.

March 19, 1973.

Marvin A. Miller, Rich, Pott, Wetherell, Foster & Miller, Cincinnati, Ohio, for plaintiff.

Robert G. Stachler, Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendants.

## FINDINGS AND CONCLUSIONS

HOGAN, District Judge.

The plaintiff, Clifford Jacobs Motors, Inc., has filed a four-count complaint against the defendants, Chrysler Corporation and Chrysler Motors Corporation.

Count I is filed pursuant to the Automobile Dealer's Day in Court Act, Title 15 U.S.C. Section 1221 et seq., charging that the defendants have failed to act in good faith in complying with the terms of a franchise agreement dated May 31, 1957, and "amended" on October 19, 1970, in that the defendants have advised the plaintiff that they will not renew such agreement beyond January 18, 1973.

Count II is filed under Title 15 U.S.C. Sections 1, 4, 15, 22, and 26, and alleges that the defendants breached the above-mentioned franchise agreement with the plaintiff by establishing and operating Chrysler-owned dealerships in direct competition with the plaintiff. Plaintiff further alleges that the defendants undertook the franchise agreement with the plaintiff and the establishment of these Chrysler-owned and operated dealerships as part of a conspiracy to fix or control unlawfully the price of Plymouth automobiles and to restrain trade in the selling of Plymouth automobiles.

Count III is brought under Title 15 U.S.C. Sections 2, 4, 15, 22, and 26, and alleges that the defendant established such Chrysler-owned dealerships and executed the franchise agreement to monopolize or in an attempt, or in pursuance of a conspiracy to monopolize the sale of Plymouth automobiles.

Relying on diversity jurisdiction, plaintiff brings Count IV under Ohio Revised Code, Sections 1333.71 to 1333.-78, which sections can be described as Ohio's equivalent to the federal Automobile Dealer's Day in Court Act.

On all four counts plaintiff seeks a temporary and permanent injunction restraining the defendants from interfering with or terminating the franchise agreement. Plaintiff also seeks money damages on all four counts.

This action is now before the Court on plaintiff's motion for preliminary injunction. By agreement of the parties the motion is submitted on the pleadings, affidavits, depositions, and memoranda filed herein.

The plaintiff, Clifford Jacobs Motors, Inc. ("Jacobs Motors"), is a corporation engaged in the business of selling and servicing new and used cars. Its facilities are located at 499 East McMillan Street, in Cincinnati, Ohio.

The defendants, Chrysler Corporation and its wholly owned subsidiary, Chrysler Motors Corporation ("Chrysler" shall be used to designate both defendants) are corporations engaged respectively in the manufacture and distribution of motor vehicles.

The plaintiff has been a franchised automobile dealer since 1931. It is a family-owned and operated business run in the informal manner that is common to family businesses. Until his death, the father, Clifford Jacobs, Sr., was its president, general manager, and treasurer. His sons, Clifford, Jr., Tom, and Harlan, were employed as salesmen and general officers of the business. Some time after plaintiff's incorporation in the mid-50's, Clifford, Jr. started to assume the responsibilities of sales manager, in addition to being a car salesman, and ultimately succeeded his father as plaintiff's president and general manager.

On May 31, 1957, plaintiff entered into a franchise agreement, entitled "Desoto-Plymouth Direct Dealer Agreement," with Chrysler. This franchise

agreement gave Jacobs Motors a non-exclusive right to purchase new Plymouth automobiles from Chrysler and to sell them in a specifically designated area known generally as the Cincinnati Metropolitan Area. This agreement had no specific term, but paragraph 21 thereof allowed Jacobs Motors (referred to in the agreement as "Direct Dealer") to terminate for any reason on not less than 30 days' written notice. That same paragraph also provided that Chrysler (referred to in the agreement as "Desoto-Plymouth") could terminate the agreement on not less than 90 days' written notice for any of five enumerated reasons. One of the reasons which would allow Chrysler to terminate the agreement was the death of any person listed in paragraph 2 of the agreement as a person upon whose continuing participation in the management of the Direct Dealer's organization Chrysler had relied in entering into the agreement. Clifford Jacobs, Sr. was the only person listed in paragraph 2 of the agreement.

Paragraph 24 of the 1957 agreement provided that on the termination of the agreement by reason of the death of any person named in paragraph 2 Chrysler would, if it had been requested by the deceased during his lifetime, offer a special Direct Dealer agreement to the person the deceased had nominated as his successor. This special agreement was to be limited to a term of two years and was for the express purpose of determining whether the person nominated possessed the qualifications based on performance during the two years to qualify for the regular Direct Dealer agreement. If Chrysler determined that the person nominated did possess such qualifications, Chrysler was to offer the regular Direct Dealer agreement to such person, at the expiration of the two-year term.

On July 18, 1967, Clifford Jacobs, Sr., acting under paragraph 24 of the 1957 agreement, requested of the defendants in writing that his son, Clifford Jacobs, Jr., be considered his successor and be allowed to continue the franchise after his death.

On March 27, 1970, Clifford Jacobs, Sr. died. Although no written notice of termination was given by the defendant following the death of Mr. Jacobs, Sr., the evidence reveals that both the parties treated the 1957 agreement as terminated at that time.

On May 11, 1970, a meeting was held in Chrysler's Cincinnati regional office between Clifford Jacobs, Jr., his brothers Tom and Harlan, and W. Howard Beckner, the District Manager for the Cincinnati Metropolitan District of the Chrysler Motor Division, and Philip O'Neil, Regional Sales Manager of the Cincinnati Region. At this meeting the representativies of Chrysler reviewed with Jacobs and his brothers the terms of the successor provision (paragraph 24 of the 1957 agreement), reminded him of the plaintiff's poor sales performance under his father's management, and stressed the need for improvement during the term of the two-year special agreement.

At a second meeting on May 21, 1970, at the defendant's Cincinnati office, Jacobs, Jr. was present with his attorney, Marvin Miller. Chrysler was again represented by Beckner and O'Neil. The latter had called the meeting in order to have the parties execute the two-year special franchise agreement. This proposed two-year agreement was substantially similar to the 1957 agreement, except that it was to terminate automatically, without notice, at the end of a two-year term. Ninety days before the expiration of the term, Chrysler was to determine for itself whether Jacobs, Jr. had demonstrated that he possessed the qualifications based on plaintiff's two-year performance to qualify for a regular Direct Dealer agreement. Mr. Miller, representing the plaintiff and Jacobs, Jr., objected to the automatic termination provision. In addition, Miller wanted the 11.56% "minimum sales responsibility" or MSR figure which had been allocated to the plaintiff when Ja-

cobs, Sr. was running the business, and which was retained in the proposed two-year agreement, reduced.

Some explanation of what MSR is, its importance in the context of the franchise agreement, and the manner in which it is computed are in order here. Paragraph 7 of the standard Plymouth Direct Dealer Agreement Form 57–P provides in part:

"Direct Dealer agrees to sell at retail in [its] Sales Locality the number of new Plymouth passenger cars necessary to fulfill Direct Dealer's Minimum Sales Responsibility . . ."

Paragraph 21 provides that the Direct Dealer's failure to attain its MSR is a ground for termination of the agreement by Chrysler.

The method of computing a dealer's MSR is set forth in paragraph 7 of Form 57–P. The first step in this computation is the determination of Plymouth's "regional market penetration." In order to determine Plymouth's "regional market penetration" for any of the 22 market regions comprising the national market, Chrysler computes the ratio of new Plymouth cars registered in a region in a twelve-month period to the number of all other new cars registered in the region in the same period. This ratio, in the form of a percentage is then representative of Plymouth's "regional market penetration." Thus, if in a year's period 10,000 new passenger cars are registered in a region and 1,000 of these are Plymouths, the market penetration of Plymouth in the region would be 10%. This ratio is then applied to the "Sales Localities" comprising the regions to arrive at the MSR for the Plymouth dealers therein. Thus, if in a dealer's Sales Locality 1,000 new cars are registered in a year's period, the dealer's MSR is 10% of that number or 100 new Plymouths.

Where there are several Plymouth dealers in one Sales Locality, each dealer is allocated a "fair share" of the MSR of the locality as his MSR. In allocating the "fair share" percentage among dealers in the sales locality, Chrysler market analysts consider the socioeconomic conditions prevailing in a dealer's immediate market vicinity and the relative sales performance of competing non-Plymouth new car dealers in that area as compared to the performance of the "average" dealer in that same line of cars. The socioeconomic conditions are gauged by the number of new cars annually registered in an area, the presumption being that the affluant purchase new cars more often than their poorer cousins. Correlating these two factors, the defendants determine the lucrativeness of the dealer's immediate market vicinity, or the "relative importance of the market place" and on that basis assign each its "fair share" or percentage of the total Sales Locality MSR.

Paragraph 7 provides that where appropriate Plymouth will adjust the Direct Dealer's MSR to take into account factors directly affecting the dealer's sales opportunities, such as "local conditions," the availability of passenger cars, or the recent trend in the dealer's sales performance.

One more point regarding MSR. Since Plymouth's "regional market penetration" is calculated as to an entire sales region, it is an average of the performance of many Sales Localities, and when that percentage is applied to compute the MSR for particular sales localities it follows of necessity that some sales localities and some dealers within a sales locality will achieve greater than their MSR and some will achieve less. Thus it is impossible for all the dealers in a sales region to achieve their respective MSR.

The May 21st, 1970 meeting between Chrysler representatives, Jacobs, and Miller adjourned with the proposed two-year agreement unsigned, because of the dispute regarding the automatic termination provision and the 11.56% MSR provision.

Following the May 21st meeting, there were telephone conversations and other less formal meetings between the par-

ties, Chrysler insisting that the proposed two-year agreement package remain the same and Jacobs Motors, represented by Miller, insisting on the deletion of the automatic termination provision and reduction of the plaintiff's MSR. During this period Jacobs refused to sign any form presented by Chrysler bearing the MSR figure of 11.56%.

In a letter dated July 14, 1970, O'Neil expressed Chrysler's impatience with the delays in executing the two-year franchise agreement and informed Jacobs that unless Chrysler heard from him immediately as to the exact date when the agreement could be signed, Chrysler would assume that he no longer was interested in the dealership.

On July 20, 1970, Miller wrote defendant's Cincinnati District Manager, insisting that the plaintiff's MSR figure should be adjusted pursuant to paragraph 7 of the proposed two-year agreement to take into consideration certain factors affecting plaintiff's sales performance. The factors which Miller thought should lower the MSR figure were the recent downward trend in the plaintiff's sales performance, the disruption of traffic on the street on which the dealership fronted due to highway construction, and the changing of that street from two-way to one-way traffic.

On August 27, 1970, Miller and Jacobs again met with defendant's District Manager in Chrysler's Cincinnati Regional Office. At that time they were informed that Chrysler had decided, pursuant to their request, to reduce the MSR figure and to offer the plaintiff a two-year franchise agreement. Chrysler insisted, however, that the automatic termination provision be retained. Miller computed what the reduced MSR figure would mean to plaintiff's sales in terms of car units and advised Jacobs to sign the agreement. The agreement thus signed was forwarded to defendant's Detroit office, where it was accepted and executed on October 19, 1970.

Perhaps in order to dispel any doubts as to the legal viability of the preceding 1957 agreement, the first prefatory declaration in the new two-year Direct Dealer's agreement stated:

"Whereas, the Desoto-Plymouth Direct Dealer Agreement dated May 31, 1957, between Clifford Jacobs Motors, Inc. and Chrysler Motors Corporation was terminated on March 27, 1970, because of the death of Clifford Jacobs, Sr. . . . ."

The completed two-year agreement was substantially the same as the 1957 agreement between Chrysler and Clifford Jacobs, Sr. on behalf of the plaintiff, except for the automatic termination provision. Whether the plaintiff was to be offered a regular Direct Dealer's agreement at the end of the two years was to depend on whether Jacobs possessed "the qualifications, capital and facilities, based on performance during the period" he ran the dealership. This "performance" was understood by both parties to mean attainment, or at least substantial improvement toward the attainment of the plaintiff's MSR as provided in paragraph 7 of the agreement.

In most if not all negotiations preceding the signing of this October 19th agreement, Chrysler representatives had emphasized to Jacobs, Jr. the failure of the plaintiff under the management of his father to meet the assigned MSR, the generally poor and deteriorating sales performance of the plaintiff, and the need for the plaintiff to achieve its assigned MSR over the term of the new agreement in order to qualify for a regular Direct Dealer's Agreement.

On at least one occasion prior to the execution of the new agreement, representatives of the defendant had reviewed with Jacobs past "Sales Responsibility Review" forms which were submitted quarterly to the plaintiff and which went over the plaintiff's sales performance, gave what Chrysler considered to be the major cause of the plaintiff's poor sales performance, and offered suggestions as to appropriate corrective action. For several years prior to the death of Clifford Jacobs, Sr., the plain-

tiff had completely failed to meet its MSR and under the heading of "Major Cause of Below Average Sales Performance" consistent criticisms were the plaintiff's failure to adequately advertise and promote their automobiles, and the plaintiff's lack of sales direction. Other criticisms were the lack of an adequate sales force and the complacent attitude of plaintiff's management. The Chrysler representatives pointed out these criticisms to Jacobs, suggested corrective action and stated the need for immediate improvement toward the attainment of the MSR.

Plaintiff's sales performance following the execution of the new agreement continued to decline. Despite the reduced MSR percentage and the consequent unit reduction, plaintiff continued to accomplish only slightly more than 50% of its allocated MSR, and sales of car units actually declined from 180 in the 1969 model year to 160 in 1970, and 140 in 1971. In 1972 the unit sales rose slightly to 148, which was still only a 54.2% accomplishment of the MSR. This despite the fact that unit sales of Plymouths in the Cincinnati Metropolitan Area increased steadily in those years and that at least one of the "local factors" presented to the defendants in order to justify the reduction of the MSR figure, i. e., the partial blocking of McMillan Street and the detouring of traffic around parts of the street in order to allow construction on the I–71 Highway had ceased as of late July 1971. In terms of sales performance in relation to MSR, plaintiff had the worse record in Cincinnati.

During the term of the two-year agreement, Chrysler continued to submit to the plaintiff quarterly "Sales Responsibility Review" forms, pointing out its continued poor sales performance, its failure to approach attainment of its MSR, the lack of advertising, and its failure to initiate an organized sales effort.

Despite the steadily deteriorating sales performance of the plaintiff, the business continued to be run substantially as before. Plaintiff's advertising budget and method of advertising, which the evidence reveals to be inadequate and ineffectual, remained the same. There appears to have been no clear delegation of authority or responsibility over the various aspects of the business to any particular person. There is evidence that plaintiff hired one or two new salesmen, but one of these devoted all of his time to the sale of used cars and the remaining one served only as replacement for Clifford Jacobs, Sr., who had acted as a part-time salesman. Only the plaintiff's service department substantially increased its volume, and this seems to have had little or no effect on the volume of new car sales.

There is no evidence in this record of any substantial capital expenditures, at least of Chrysler's insistence, and the record is barren of any evidence of coercion, intimidation, or threats thereof by Chrysler (except possibly some parts shipments without orders, the detail of which is not in the record).

Although it was obvious that the plaintiff could not attain even the reduced MSR, there is no evidence that Jacobs ever sought its further reduction during the time of the two-year agreement.

Through a letter dated October 18, 1972, Chrysler's Vice-President informed Jacobs that based on the poor performance of the plaintiff over the past two years, they had determined that he did not possess the qualifications for a Direct Dealer Agreement, and that therefore he would not be offered such agreement at the expiration of the two-year term. Although that agreement was to terminate the following day, October 19th, Chrysler extended the effective date of termination to 90 days following Jacobs' receipt of the letter in order to give him the opportunity to wind up his affairs in "an orderly manner." Prior to the extended termination date of January 17, 1973, plaintiff filed the instant action.

Two additional findings should be made here. There is evidence introduced which shows that during the term of the October 19th agreement, three other Plymouth dealers in the Cincinnati Metropolitan Area also failed to meet their allotted MSR. These dealerships have not been terminated, nor is there any indication of plans to have them terminated.

Secondly, there is evidence that during the term of the two-year agreement and for some time prior to its execution, there were operating in the Cincinnati Metropolitan Area several Plymouth dealerships which were established and operated by the Marketing Investment Division of Chrysler. These MID dealerships were capitalized either wholly or partially by Chrysler in the areas where it had determined that the market was ripe for a Plymouth dealership and private capital was either lacking or inadequate. Chrysler would provide all or part of the initial financing and operate the dealership in conjunction with the prospective purchaser, whose share of the profits from the operation would be applied to the purchase price of the dealership until it was ultimately bought out. There was no substantial evidence that these MID dealerships affected the plaintiff's sales in any way, or that they were intended to drive privately owned dealerships out of business.

Counts II and III of the complaint are brought pursuant to the Sherman Antitrust Act, Title 15 U.S.C. Sections 1, 2 and 4, and the Clayton Act, Title 15 U.S.C. Sections 15, 22 and 26. The only evidence introduced to support these claims is in the deposition of Donald James Cundy, Field Operations Manager for Chrysler, concerning the operation and establishment of MID dealerships in Cincinnati and an exhibit attached to the complaint showing an advertisement of one of these MID dealerships in the Cincinnati area touting new Plymouths for $100 below cost. The date on which the advertisement was published is not revealed. The antitrust claims are not even touched upon in the plaintiff's memorandum in support of its summary judgment motion and from this we assume that plaintiff has abandoned the antitrust claims as a basis for the preliminary injunction. In any case we find the evidence produced in support of these claims completely inadequate to support the preliminary injunction under F.R.Civ.P. 65.

█ Count IV charges that the defendants have violated Ohio Revised Code Sections 1333.71 to 1333.78 in failing to renew the franchise agreement without plaintiff's consent and without just cause. The effective date of these Code Sections is November 18, 1971. The plaintiff charges that the defendants wrongfully failed to renew the contract executed on October 19, 1970. We do not think that this 1971 legislation was intended to apply retroactively to contracts executed before its effective date.

Ohio Revised Code, Section 1.48 provides:

"A statute is presumed to be prospective in its operation unless expressly made retrospective."

In Rairden v. Holden, 15 Ohio St. 207 (1864), the court, finding that the terms "retroactive" and "retrospective" as applied to laws are synonymous, quoted with approval the definition of the latter given by Mr. Justice Story in The Society v. Wheeler, 2 Gallison's R. 105, 139, 22 Fed.Cas. pp. 756, 767:

"Upon principle, every statute which takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past must be deemed retrospective."

There can be little doubt that Sections 1333.72 and 1333.74 are retroactive or retrospective laws in that they enlarge contractual duties undertaken before the enactment of the statutes. Section 1333.72 provides in part:

"Notwithstanding the terms, provisions, or conditions of any agreement

or franchise, no manufacturer engaged in the sale and distribution of motor vehicles . . . . shall

"(a) In acting or purporting to act under the terms, provisions, or conditions of an agreement or franchise, or in terminating, canceling, or failing to renew a franchise, fail to act in good faith. * * * "

Section 1333.73 provides:

"No manufacturer shall terminate, cancel, or fail to renew a franchise or an agreement without the prior consent of the dealer, for other than just cause. Notwithstanding the provisions of any agreement or franchise setting forth prima-facie grounds for terminating, cancelling, or failing to renew a franchise or agreement or which defines just cause for terminating, cancelling, or failing to renew a franchise or agreement, such determination of just cause shall be made by a court of law after due consideration of, but without being bound by, the definition of just cause contained in such agreement or franchise. * * * "

The two above-quoted statutes impose the duty on a manufacturer to refrain from cancelling or terminating or failing to renew a franchise agreement other than "for just cause" or with the consent of the dealer, *notwithstanding* provisions in an agreement which might allow the manufacturer to terminate the contract at will, or for other reasons which may not be interpreted by a court as for "just cause." In fact, Section 1333.73 requires no less than a judicial interpretation of what constitutes "just cause," and a continuance of the dealership during the judicial proceeding. As applied to contracts entered into prior to their effective dates, these statutes are obviously retroactive or retrospective.

The plaintiff's comparison of the Ohio statutes with the federal "Automobile Dealer's Day in Court Act," Title 15 U.S.C. Section 1222, which specifically provides that it is effective as to bad faith terminations, cancelling and failure to renew occurring "from and after August 8, 1956," only points out the absence of any similar specific provision in the more recent Ohio statute establishing a standard of application and reinforces the conviction that Ohio Revised Code Section 1.48 compels the prospective application of Sections 1333.73 and 1333.-74. This interpretation has been given to similar state statutes in Buggs v. Ford Motor Company, 113 F.2d 618 (7th Cir. 1940) and General Motors Corporation v. Blevins, 144 F.Supp. 381 (D.C. Colo.1956). Although the district court in Willys Motors v. Northwest Kaiser-Willys, 142 F.Supp. 469 (D.Minn.1956) held that a Minnesota "Automobile Dealer's" Act similar to the Ohio Act had retrospective application, it seems that Minnesota had no interpretive statute similar to Ohio Revised Code Section 1.-48.

In the absence of any express provision in Section 1333.73 and 1333.-74 indicating that the legislature intended these statutes to be retrospective, and in the absence of Ohio decisions on this matter, we think that due regard for the statutory presumption requires us to find that Sections 1333.73 and 1333.74 are prospective in operation and are not therefore applicable in this case.[1]

Plaintiff brings Count I under Title 15 U.S.C. Sections 1221 and 1222, the so-called "Automobile Dealer's Day in Court Act." Section 1222 provides as follows:

"An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said

---

1. The Ohio statute has not been construed by the State Courts and, at least in an injunction status, should be construed by this Court in a manner which will avoid any constitutional question.

automobile [dealer] from and after August 8, 1956, to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling or not renewing the franchise with said dealer: Provided, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith."

"Good faith" is defined in Section 1221 as follows:

" * * *

"(e) The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

■■ The legislative history of the Act makes it clear that the term "good faith" as used therein is not to be given an expansive definition:

" * * * In each case arising under this bill, good faith must be determined in the context of coercion or intimidation, or threats of coercion or intimidation. * * *" H.R.Rep. No. 2850, 84th Cong.2d Sess. 9 (1956), 3 U.S. Code Cong. and Admin.News 1956, pp. 4,596, 4,603.[2]

■ It is established that the reference to damages in Section 1222 does not preclude the granting of an injunction against termination, cancelling, or failure to renew the franchise agreement. Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2nd Cir. 1970); Madsen v. Chrysler Corp., 261 F.Supp. 488 (N.D.Ill.1966), vacated as moot 375 F.2d 773 (7th Cir. 1967).

In paragraph 7 of Count I the plaintiff complains that the defendants coerced and interfered in the operation of plaintiff's business by threats of termination and of not renewing plaintiff's franchise agreement if plaintiff failed to hire more sales personnel, improve its physical facilities, increase its sales promotion and advertising, purchase more vehicles, revise compensation plans, and "operate as directed by defendants."

■ The evidence adduced by the plaintiff in support of the above charges is sparce indeed. The deposition of Clifford Jacobs, Jr. reveals that he was unable to name one occasion on which any representative of the defendant stated to him or anyone associated with the plaintiff that unless plaintiff initiated the above actions, its franchise agreement would not be "renewed." In fact, the evidence reveals that what the plaintiff has labeled as threats were in fact suggestions listed under the heading of "Corrective Action Necessary" in the various Sales Responsibility Review forms submitted quarterly to the plaintiff by Chrysler. These suggestions were remedial steps which defendant felt were necessary to improve plaintiff's sales performance. As noted above, Section 1221 specifically provides that "recommendations" shall not be deemed to constitute a lack of good faith. We find that the acts of which

---

2. "Good faith" is to be literally and not liberally construed. Its presence or absence must be determined in the context of "coercion, intimidation or threats of coercion or intimidation." In other words, the "bad faith" consists of some coercion or intimidation designed to obtain something which the manufacturer does not have a contractual right to. To threaten what the manufacturer has a contractual right to do "if the glove fits" is not bad faith. Such is the law in this Circuit. Frank Chevrolet v. General Motors, 304 F.Supp. 307 (N.D.Ohio 1968) aff. 419 F.2d 1054 (6th Cir. 1969). The same cases establish that it is not "bad faith" to refuse to renew or cancel with respect to a dealer whose "sales performances * * * consistently fell below acceptable standards in violation of the agreement between the parties."

the plaintiff complains were mere recommendations. As the Court in Victory Motors of Savannah, Inc. v. Chrysler Motors Corp., 357 F.2d 429 (5th Cir. 1966) stated:

"Proof offered that representatives of Chrysler were insisting [the dealer] sell more cars, that it advertise in a certain way, that it hire more salesmen, are things which are not prohibited by the Automobile Dealers Suits Against Manufacturers Act." 357 F. 2d 429, at 432.

See also Garvin v. American Motors Corporation, 318 F.2d 518, 520 (3rd Cir. 1963).

■ In the same way, the repeated warnings by Chrysler to Jacobs that the failure of the plaintiff to improve its lacklustre sales performance could result in the loss of a regular franchise agreement at the expiration of the two-year agreement was simply a restatement by Chrysler · of the terms of the two-year agreement to which plaintiff had, after negotiation, consented. Coercion, intimidation or threat in the context of the Act must include a wrongful demand which will result in sanctions if not complied with. Berry Brothers Buick, Inc. v. General Motors Corp., 257 F. Supp. 542 (E.D.Pa.1966). To demand what has been previously agreed to by the parties can in no sense be wrongful. As the Court in *Victory Motors*, supra, stated:

"The Automobile Dealers Suits Against Manufacturers Act was not intended to prohibit threat of cancellation of a franchise if there should be a prolonged failure on the part of the dealer to heed recommendations or yield to persuasion of the manufacturer that he make a bona fide effort to comply with his undertakings." 357 F.2d 429, at 432.

Paragraph 8 of Count I of the complaint alleges that the MSR quotas of new cars established by the defendant for the plaintiff were arbitrary and capricious, and designed to destroy the ability of plaintiff to operate in its business. Plaintiff charges further that the defendants had arbitrarily refused to adjust the quota to reflect the local conditions as provided by paragraph 7 of the Direct Dealers Agreement.

■ The reasonableness and fairness of the Chrysler-computed MSR has been established in several cases brought under Section 1222. *Victory Motors*, supra; Zebelman v. Chrysler Corp., 299 F.Supp. 653 (E.D.Mo.1968). Similar MSR computation by the Ford Motor Company was upheld in Milos v. Ford Motor Co., 317 F.2d 712 (3rd Cir. 1963).

Plaintiff's allegation that Chrysler refused to adjust the MSR figure to reflect local conditions as provided by paragraph 7 of the franchise agreement is, on the evidence adduced herein, patently untrue. Indeed, it was at plaintiff's insistence, and after substantial negotiation, that the MSR figure was reduced from 11.56% to 8.24% to reflect local conditions which the plaintiff asserted were hampering its sales performance.

It is on this very point of the adjustment of the MSR to reflect local conditions that we distinguish those cases which plaintiff cites in support of its contention that the MSR figure as computed by Chrysler is unfair. In both Swartz v. Chrysler Motors Corp., 297 F. Supp. 834 (D.N.J.1969), and Madsen v. Chrysler Corp., 261 F.Supp. 488 (N.D. Ill.1966), the Court's findings that the failure of Chrysler to adjust the MSR figure to reflect local conditions was a prime factor in their ultimate conclusion that as to the dealers in those cases, the MSR provisions were arbitrary, coercive and unfair. The cases are further distinguishable on the grounds that there was substantial evidence that Chrysler was not displeased with the sales performance of the dealers despite the failure of the dealers to attain their MSR figures and that termination and failure to renew in the respective cases for failure to attain the quotas were merely pretexts. Cf. Zebelman v. Chrysler Corp., supra, 299 F.Supp. at 658.

The Court in *Zebelman* also answered the implication of plaintiff herein that the failure of the defendants to terminate other dealers franchises who had not attained their MSR is evidence that the MSR was merely a standing pretext which Chrysler could call on to terminate at will, unfairly, and in violation of the franchise agreement. The *Zebelman* Court noted:

"The franchise agreement does not require that a dealer who falls below his assigned MSR must be terminated. It merely makes termination possible. . . . . As applicable to termination of the franchise due to sales below MSR, 'good faith' would require that termination be actually based on poor performance and not based, in fact, on some ulterior motive." 299 F.Supp. 653, at 658.

With the remaining allegations in paragraph 8 and paragraph 9 of Count I, we need deal only briefly. Plaintiff's allegation that Chrysler established the MID dealerships to compete unfairly with the plaintiff and to destroy his business is not supported by the evidence. The testimony that these dealerships were established with the intent to have them ultimately bought out by private owners and that many have indeed been bought out is uncontradicted, as is the evidence that plaintiff's sales performance continued to decline as these dealerships were acquired by private owners.

The allegations in paragraph 9 of Count I that plaintiff was forced by the defendants to buy current model Plymouth cars from the defendant at auction, for whatever it was intended to show, is by the testimony of Jacobs, himself, untrue.

In order to prevail on a motion for preliminary injunction, a plaintiff has the burden of establishing a clear case of irreparable injury, of convincing the court that the balance of injury favors the granting of an injunction, and of establishing the probability of success at a trial on the merits. Garlock, Inc. v. United Seal, Inc., 404 F.2d 256 (6th Cir. 1968). Without deciding whether the plaintiff has established irreparable injury and conceding that the balance of injury weighs in its favor, we nevertheless conclude that it has failed completely to convince us that it will more likely than not succeed at a trial on the merits on any of the four counts charged. It would therefore be inappropriate and an abuse of discretion for this Court to issue a preliminary injunction requiring the defendants to abide by the expired two-year franchise agreement with the plaintiff pending a trial on the merits. Zebelman v. Chrysler Corp., supra.

An order consistent herewith may be presented after the expiration of the 10-day period within which any request for amended or supplemental findings may be filed. The status quo should continue to be maintained by the parties pending entry of an order denying plaintiff's motion.