**AMERICAN MART CORPORATION, Plaintiff,**

v.

**JOSEPH E. SEAGRAM & SONS, INC., Defendant.**

**Civ. No. LV 85–543 RDF.**

United States District Court, D. Nevada.

Oct. 24, 1985.

Fred W. Kennedy, Las Vegas, Nev., William F. Nelson, Thomas M. Pryor, Stafford, Rosenbaum, Rieser and Hansen, Madison, Wis., for plaintiff.

Morton R. Galane, William E. Crockett, Las Vegas, Nev., Simpson, Thacher & Bartlett, Barry R. Ostrager, David W. Ichel, New York City, for defendant.

## DECISION

ROGER D. FOLEY, Senior District Judge.

## CONTRACTUAL RELATIONSHIP OF THE PARTIES

The House of Seagram, Joseph E. Seagram & Sons, Inc. (Seagram), through its Calvert Division and through its Seagram Distillers Company Division, entered into nearly identical written franchise agreements with the DeLuca houses of Southern Nevada, Calvert with Nevada Beverage on August 1, 1972, and Seagram Distillers with DeLuca Importing on August 1, 1973. Both written contracts were for a term of one year. By written addenda the Seagram Distillers contract was extended year by year for three years to and including July 31, 1977. It can reasonably be inferred that the Calvert contract was likewise extended by written addenda but no such written addenda were offered in evidence. Even if the Calvert contract was not extended, as was the Seagram Distillers contract to July 31, 1977, both written contracts provided that unless terminated by Seagram and Calvert they would continue in effect from month to month, and the evidence is that Seagram and Calvert never gave notice to terminate the same. Both contracts provided, in paragraph 19 thereof, as follows:

"Notice Prior to Expiration. If (Seagram-Calvert) does not intend to renew this agreement or enter into another agreement with Distributor upon the expiration hereof, then (Seagram-Calvert) shall give Distributor at least thirty (30) days advance written notice of said intent. If (Seagram-Calvert) fails to give said notice, then this agreement shall continue in full force and effect on a month to month basis until such time as said notice is given and for 30 days thereafter."

This Court finds that according to their terms, the two written franchise contracts of August 1, 1972, and August 1, 1973, could have continued to date because Seagram never terminated them.

Seagram asserts that there were in effect from 1967 to 1972 and 1973 a series of similar written franchise agreements. In evidence are Calvert-Nevada Beverage contracts from 1967 to 1970. There is testimony that there were Seagram Distillers-DeLuca Importing written franchise agreements from 1967 forward.

In the spring of 1977 William Wirtz began negotiations with Robert Keyser of the DeLuca houses to purchase the assets of Nevada Beverage and DeLuca Importing and, when a purchase seemed likely to occur, Wirtz addressed a letter of intent to purchase to Keyser, dated February 7, 1977, the terms of which were accepted in

writing by Keyser for DeLuca Importing, and Pat Clark for Nevada Beverage.

Paragraph 5 of the letter of intent provided as follows:

"As a condition of this agreement, it is the understanding of the parties that you and the undersigned jointly will obtain, prior to the date of closing, approval and consent for the assignment of all of your existing distributor rights and privileges with eighty per cent (80%) of your suppliers (based on gross sales volume) of which the following suppliers must be included, to-wit: Seagrams, Heublein, Brown-Forman, Bacardi, Christian Brothers, Hiram Walker, Beam, Calvert and Schieffelin."

By telephone, Wirtz sought from Seagram and from some thirty other suppliers of the DeLuca houses their consent that, if the company to be formed by Wirtz, American Mart Company (AMC), purchased the assets of the DeLuca houses, such suppliers would franchise the Wirtz company with the product then being sold by the DeLuca houses.

Being satisfied with the majority of the suppliers' responses, Wirtz, on May 16, 1977, through AMC, acquired the assets of the DeLuca houses for some four million dollars.

The written franchise agreements of 1972 and 1973 between Seagram and the DeLuca houses were not assigned in writing to AMC by the DeLuca houses; were not assumed in writing by AMC; and no consent to assignment was given in writing by Seagram.

From May 1977 until June 1985, Seagram and AMC enjoyed a compatible and prosperous supplier-distributor relationship. AMC became the Southern Nevada distributor for Seagram for nearly all the brands that the DeLuca houses had distributed almost exclusively in Southern Nevada for many years (1946–1977).

On June 13, 1985, because Seagram had undergone a major national reorganization calling for the realignment of its brands and the substantial reduction of the number of its distributors throughout the country, Seagram terminated AMC franchises for all of its brands. At the end of August 1985, Seagram franchised Southern Wine & Spirits Company as Seagram's exclusive distributor in Southern Nevada. Southern had for some time been a distributor of Seagram brands other than those sold by AMC.

## THIS ACTION

There being diversity of citizenship between the parties and the judicial amount being presented, AMC, on July 1, 1985, brought this action against Seagram charging that the termination of the AMC franchises in Southern Nevada violated the Nevada Alcoholic Beverage Franchise Act that became effective April 30, 1973. *Nevada Revised Statutes* 598.290–598.350 and 598.351, a copy of which is attached as Exhibit A hereto. AMC sought a temporary restraining order and a preliminary injunction restraining Seagram from terminating the AMC franchises and transferring those franchises to another distributor or distributors. AMC also sought damages. After hearing on the application for preliminary injunction, this Court consolidated that application with a trial on the merits. The consolidated matter was tried to the Court on October 15 through October 18, 1985, and submitted for decision.

## DISCUSSION

For two groups of experienced businessmen, used to dealing in the millions of dollars, this case presents a rare spectacle of careless mishandling of important legal relationships. Had the parties carefully consulted with and followed their counsel's advice, very likely this lawsuit would not have been filed.

Instead of requiring AMC to execute a properly drawn written agreement by which AMC would step into the shoes of the DeLuca houses and assume DeLuca obligations under the then ongoing written franchise agreements, after several telephone conversations and some correspondence between Wirtz and Seagram's repre-

sentatives, Seagram began to deliver and delivered product to AMC from May 1977 through June 1985 without interruption substantially as it had delivered product to the DeLuca houses.

■ Keyser, because he was told so by Seagram's representatives, believed and in turn told Wirtz that DeLuca had an exclusive oral franchise arrangement with Seagram, this despite the express language of the ongoing written franchise agreements that Seagram could appoint other distributors of its product in Southern Nevada. Because he was led to believe that the written franchise agreements were mere formalities and meant nothing, Keyser did not show the written contracts to Wirtz and Wirtz never knew until shortly before this litigation began that the DeLuca houses had ongoing written franchise agreements with Seagram for the Southern Nevada market.*

Wirtz was at fault in not seeking to learn if there were written franchise agreements between Seagram and the DeLuca houses. Although the evidence is that most liquor franchise contracts are oral, Wirtz did have written franchise contracts with Seagram in two other markets and with other liquor suppliers in other markets.

This Court believes that it was the intent of Seagram to have Wirtz step into the shoes of Keyser and assume the ongoing franchise agreements between Seagram and the DeLuca houses. Seagram urges this Court to find that from the words used in conversations by telephone and face to face and from the language of certain correspondence between the parties in evidence, Wirtz knew he was stepping into Keyser's shoes and that he intended to do so. If this Court would so find, then the ongoing written franchise agreements would govern the parties hereto and such agreements provide that this dispute over

termination of the AMC franchises be resolved by arbitration.

Seagram, contending that there were written franchise agreements between it and the DeLuca houses continuously from 1967 to date, argues that the Nevada Alcoholic Beverage Franchise Act, which became effective on April 30, 1973, does not apply to this case.

While this Court does find that Seagram intended to have Wirtz step into Keyser's shoes, there was no meeting of the minds as to the essential terms of the agreement between Seagram and Wirtz. Wirtz never knew, and this Court believes him, of the written franchise contracts of 1972 and 1973 until just before this litigation began. Wirtz believed he had an oral franchise contract with Seagram.

■ Considering that Seagram and Wirtz had different understandings of the nature of their relationship, it is easy to see why otherwise unambiguous language in the correspondence and in oral conversations between the parties was understood and read by them in different lights. Since there was no meeting of the minds between Seagram and Wirtz, there was no contract entered into between them in May 1977. However, a supplier-distributor relationship did begin then and continued successfully for both parties from May 1977 through June 13, 1985. Since the ongoing written franchise contracts between Seagram and the DeLuca houses, although in effect in May 1977, were never assigned to or assumed by Wirtz, they do not bind AMC. This Court concludes that the written franchise contracts do not govern the parties in this case and that the supplier-distributor relationship between Seagram and AMC from May 1977 to June 1985, inclusive, was an oral, implied in fact, non-exclusive franchise agreement. The terms of that agreement are defined by the conduct of the parties each towards the other throughout

---

* Keyser was a most credible witness. Both parties agreed that he is a man of high moral character and integrity. It should be noted that were Keyser in Wirtz's shoes in the case, he would be precluded by the parol evidence rule from asserting an oral agreement in contravention of a written franchise agreement. But testimony of Keyser re what he was told by Seagram's representatives, and in turn told Wirtz, is admissible because it goes to establish Wirtz's knowledge and intent.

those years. The Nevada Alcoholic Beverage Franchise Act of 1973 does govern the relationship of Seagram and AMC and this Court must now look to that act to determine whether or not the franchise relationship between Seagram and AMC was lawfully terminated on June 13, 1985.

## CAUSATION FOR TERMINATION

The Nevada Supreme Court has yet to decide what constitutes "good cause" for termination as used in NRS 598.330(2) and 598.350, which sections provide as follows:

"598.330 Discrimination between wholesalers as to franchise terms, termination of franchise without cause prohibited.

. . . . . .

2. Notwithstanding the terms, provisions or conditions of any franchise, no supplier shall unilaterally terminate or refuse to continue any franchise with a wholesale dealer or wholesaler or cause a wholesale dealer or wholesaler to resign from such franchise unless the supplier has first established good cause for such termination, noncontinuance or causing of such resignation."

"598.350 Good faith conduct by supplier defense to civil action by wholesaler. In any action brought by a wholesale dealer or wholesaler against a supplier for termination or noncontinuance of, or causing to resign from a franchise in violation of NRS 598.290 to 598.350, inclusive, it is a complete defense for the supplier to prove that such termination, noncontinuance or causing to resign was done in good faith and for good cause."

Treating the question of the propriety of termination by liquor suppliers of distributors' franchises under state alcoholic beverage franchise laws, some state legislatures have adopted definitions of good cause for termination limited to distributor misconduct or failure of performance. Other states like Nevada do not define good cause, although in studying this legislation the Nevada Senate considered defining good cause.

AMC's counsel urge this Court to restrict the meaning of good cause to terminate franchises to cases where the distributor is at fault in some fashion. Counsel argue that while legitimate and prudent business reasons may demonstrate the good faith of a supplier's decision to terminate the franchise, such reasons do not constitute good cause for termination.

■ After considering the Nevada statute and the cases cited, and the arguments of counsel, this Court believes that under the Nevada act good cause to terminate a franchise exists even where there is no distributor fault, when in the exercise of prudent business judgment the supplier terminates the franchise for grounds that are truly legitimate and are not arbitrary, capricious, irrational, unreasonable or irrelevant.

Faced with a sharply declining alcoholic beverage market throughout the United States, and with its proportionate share of that market declining in recent years as compared with other major alcoholic beverage suppliers, Seagram, in January 1985, undertook a major reorganization to effect a number of economies by substantially reducing its expenditures, including a sharp reduction of many executives and of other personnel. The principal focus of the reorganization plan was to realign its brands among a fewer number of distributors. Seagram changed its charter to pursue a complimentary approach among its divisions to the marketing of its brands, rather than a competitive approach among its divisions that had been its policy in the past. By merging its brands into fewer distributors, Seagram hoped to produce an increased control of distributors' time and effort, more efficient use of its sales managers' time, and improved shipping efficiency and customer service. Implementing such a policy would result in increased effort behind established brands, a better system into which it could introduce new brands, all producing greater profits to Seagram and its distributors.

■ This Court has carefully considered the entire record before it in support of and

in opposition to the motion for preliminary injunction and the evidence adduced at trial and is persuaded that Seagram had good cause within the meaning of the Nevada franchise act to terminate AMC. It takes a trained and experienced mind to be able to fairly comprehend all of the factors that must be considered, given proper weight and focus in each market throughout the United States, in order to best implement Seagram's new policies and goals. While this Court has no such expertise, it can find, and has found, that Seagram has proven by a preponderance of the evidence that good cause did in fact exist to terminate AMC in June 1985 and to assign brands taken away from AMC, to Southern Wine & Spirits Company.

A careful examination of plaintiff's Exhibit 7 and defendant's Exhibit BF satisfy this Court that Seagram appears to have acted in good faith and for legitimate and prudent business purposes and that termination of AMC was not arbitrary, capricious, irrational, unreasonable or irrelevant.

As is apparent from the colloquy between the Court, counsel and witnesses during the trial, this Judge found it hard to understand how after thirty years of successful relationship with John DeLuca and Robert Keyser, and after seven years of successful relationship with William Wirtz, Seagram could have decided to terminate AMC in favor of Southern Wine & Spirits, a relative newcomer on the Southern Nevada scene. It seemed to this Judge that if it were the decision of Seagram to have only one exclusive distributor in Southern Nevada, it should have been AMC instead of Southern Wine & Spirits. But Seagram made its decision, as it had a right to do, choosing to terminate AMC and franchise Southern Wine & Spirits exclusively. This Court is satisfied that it did so in good faith and for good cause.

It is recalled that AMC's market analyst, Professor Fraser, testified that Seagram could have accomplished the goals of its reorganization in Southern Nevada by simply realigning its products between AMC and Southern Wine & Spirits and need not have terminated AMC and made Southern Wine & Spirits its exclusive distributor in Southern Nevada. The Court notes that in regard to termination the Nevada act deals not only with termination of franchises as a whole, but also with termination of specific brands as well. Hence, in order to realign its brands as Professor Fraser suggested, Seagram would have had to have good cause to do so. It appears to be inconsistent for AMC to suggest good cause for realignment of brands but not good cause for termination of franchises. If there is good cause for Seagram to take away one or more of the brands from AMC and give them to another distributor, there would be good cause to terminate AMC as distributor, because the reorganization was twofold, realignment of brands and reduction in numbers of distributors.

This decision constitutes this Court's findings of fact and conclusions of law. Plaintiff is not entitled to injunctive relief and damages. Let judgment for the defendant be entered accordingly.

## EXHIBIT A

## ALCOHOLIC BEVERAGES

## FRANCHISES BETWEEN LIQUOR SUPPLIERS AND WHOLESALERS

**598.290 Definitions.** As used in NRS 598.290 to 598.350, inclusive, unless the context otherwise requires, the words and terms defined in NRS 598.300 to 598.320, inclusive, have the meanings ascribed to them in such sections.

(Added to NRS by 1973, 1353)

**598.300 "Franchise" defined.** "Franchise" means a contract or agreement either expressed or implied, whether written or oral, between a supplier and wholesaler, wherein:

1. A commercial relationship of definite duration or continuing indefinite duration is involved; and

2. The wholesaler is granted the right to offer, sell and distribute within this state or any designated area thereof such of the

supplier's brands of packaged malt beverages, distilled spirits and wines, or all of them, as may be specified.

(Added to NRS by 1973, 1353)

**598.310 "Supplier" defined.** "Supplier" means any person, partnership, corporation or other form of business enterprise engaged in business as a manufacturer, distiller, rectifier, brewer, importer, vintner, broker or agent therefor, which distributes any or all of its brands of malt beverages, distilled spirits and wines, or all of them, through licensed wholesalers in this state.

(Added to NRS by 1973, 1353)

**598.320 "Wholesale dealer," "wholesaler" defined.** "Wholesale dealer" or "wholesaler" means any person, partnership, corporation or other form of business enterprise licensed by the Nevada tax commission to sell malt beverages, distilled spirits and wines, or all of them, as it is originally packaged to retail liquor stores or to another licensed wholesaler, but not to sell to the consumer or general public.

(Added to NRS by 1973, 1353)

**598.330 Discrimination between wholesalers as to franchise terms, termination of franchise without cause prohibited.**

1. If more than one franchise for the same brand or brands of malt beverages, distilled spirits and wines, or all of them, is granted to different wholesalers in this state, it is a violation of NRS 598.290 to 598.350, inclusive, for any supplier to discriminate between such wholesalers with respect to any of the terms, provisions and conditions of these franchises.

2. Notwithstanding the terms, provisions or conditions of any franchise, no supplier shall unilaterally terminate or refuse to continue any franchise with a wholesale dealer or wholesaler or cause a wholesale dealer or wholesaler to resign from such franchise unless the supplier has first established good cause for such termination, noncontinuance or causing of such resignation.

(Added to NRS by 1973, 1354)

**598.340 Remedies of wholesaler.**

1. Any wholesaler may bring an action in a court of competent jurisdiction against a supplier for violation of NRS 598.290 to 598.350, inclusive, and may recover the damages sustained by him, together with such costs of the action and reasonable attorney's fees as are authorized under NRS 18.110.

2. The remedies provided in NRS 598.-290 to 598.350, inclusive, are independent of and supplemental to any other remedy or remedies available to the wholesaler in law or equity.

(Added to NRS by 1973, 1354)

**598.350 Good faith conduct by supplier defense to civil action by wholesaler.** In any action brought by a wholesale dealer or wholesaler against a supplier for termination or noncontinuance of, or causing to resign from a franchise in violation of NRS 598.290 to 598.350, inclusive, it is a complete defense for the supplier to prove that such termination, noncontinuance or causing to resign was done in good faith and for good cause.

(Added to NRS by 1973, 1354)

### LIMITATIONS ON VERTICAL COMPETITION

**598.351 Statement of legislative policy.** It is the policy of the legislature to insure the orderly distribution and marketing of alcoholic beverages in this state in order to protect locally owned and operated business enterprises and those residents whose livelihoods and investments are dependent on their freedom to manage their businesses without economic and coercive control by nonresident suppliers of alcoholic beverages.

(Added to NRS by 1975, 623)