**EXCELLO WINE COMPANY, Plaintiff,**

v.

**MONSIEUR HENRI WINES, LTD., Defendant.**

No. C–2–79–376.

United States District Court, S. D. Ohio, E. D.

July 2, 1979.

James F. DeLeone, Nancy L. Sponseller, Topper, Alloway, Goodman, DeLeone & Duffey, Columbus, Ohio, for plaintiff.

Herbert R. Brown, Stephen R. Buchenroth, James L. Todd, Vorys, Sater, Seymour & Pease, Columbus, Ohio, for defendant.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on the plaintiff's motion for a preliminary injunction. Specifically, the plaintiff alleges that the defendant's proposed termination of their distributorship agreement is in violation of the Ohio Alcoholic Beverages Franchise Act, O.R.C. § 1333.82 et seq., which requires "just cause" for such termination. O.R.C. §§ 1333.84 and 85. The plaintiff therefore seeks to have the proposed cancellation preliminarily enjoined.

The defendant has set forth essentially three grounds for its argument that an injunction would be improper. First, the parties' oral distributorship agreement predates the Ohio Act and is terminable at will. The Ohio Act therefore does not proscribe this termination because the Act was not intended to apply retroactively, and because, if it does so apply, it would violate the contracts clause of the United States Constitution. Second, if the Ohio Act does properly apply to this termination, the defendant has demonstrated both its good faith and just cause for the termination. Third, the plaintiff has failed to show any injury not compensable in money damages, and therefore there exists no irreparable harm which would justify the issuance of a preliminary injunction.

An extensive evidentiary hearing was held on the motion. Based upon that hearing, the post-hearing memoranda of the parties and the other materials before it, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52, F.R.C.P.

### Findings of Fact

The plaintiff Excello Wine Company is a distributor of wine in the Columbus, Ohio metropolitan area. The plaintiff is owned by the three sons of Louis Robins, who acts as the chairman of the board. One of the sons, Stanton Robins, is the president of the company. Excello has achieved a dominant market position in central Ohio and, as Louis Robins testified, Excello and its division Globe Wine and Spirit Company presently enjoy a greater than fifty percent share of the wine market in Franklin and Delaware Counties. In those areas, Excello distributes for eighteen of the thirty largest selling wines in Ohio.

The defendant Monsieur Henri Wines, Ltd., is a New York corporation engaged in the direct importation and supply of foreign wines to distributors such as Excello. Monsieur Henri is a relatively small supplier, although it carries some three hundred different wines. The majority of its national sales in 1977 and 1978 were in its Yago and Weber lines. In those same years virtually all of the sales of Monsieur Henri wines by Excello were in the Yago and Weber lines, along with an increase in 1978 in the recently introduced Premiat brand.

The relationship between these parties began in 1954. Both parties are in agreement that the oral agreement formed by the two companies established an exclusive distributorship in the Columbus area for the Monsieur Henri Wines. That distributorship arrangement has continued without interruption for twenty-five years. No letter, memorandum, contract or other memorialization of the agreement has ever existed. Mr. Louis Robins testified that it was his understanding that the relationship was to continue as long as it was mutually profitable to the companies, and that Excello was to have unfettered discretion in the quantity of wine ordered.

Some four years ago, with the arrival of Mr. Henry Schones as president of Monsieur Henri, the company changed somewhat its marketing philosophy. Monsieur Henri determined that it would become more involved in the marketing of its wines, which would include market investigation, promotional research and advertising. An important part of that philosophy was to reduce the company's heavy reliance on Yago and Weber. In fact, this new outlook did have the effect of increasing the sales of the non-Yago-Weber portion of the Monsieur Henri line in 1978 relative to the prior year.

In these same years, Monsieur Henri has emphasized basically eight of its lines as "priority" lines. They are Yago, Weber, Premiat, Dragone, Cartier, Blanchard, Piat and Burati.[1] The dispute between these parties which resulted in this suit has primarily concerned the failure of the plaintiff to market the six lines other than Yago and Weber. For example, from September, 1977 to March, 1979, Excello has carried no inventory of Cartier. During the same period Excello has not carried any inventory of Piat, Blanchard or Burati. In 1978, Excello sold no Piat, Cartier or Blanchard.

Excello services virtually one hundred percent of the approximately 660 retail off-premise outlets, that is, stores which sell wine for consumption off the premises, in the Columbus area. While Excello has placed Yago Santgria Red in 579 of these outlets, and Weber Liebfraumilch in 462, Dragone Lambrusco can be found in only 97, Premiat in 67, and Burati, Cartier and Piat in none.

Excello has, nonetheless, sold a large percentage of the Monsieur Henri wine sold in Ohio between 1973 and 1978. From a high of 30.8 percent of Monsieur Henri Ohio wine sales in 1973, the percentage fell to 15 percent in 1977, and then rose sharply in 1978 to 25.7 percent. The figures for 1978 compare favorably with the sales of Monsieur Henri wines for other Ohio distributors.

There are other facts which, the defendant maintains, demonstrate that Excello has failed adequately to promote Monsieur Henri's wines. Despite the recent popularity of lambrusco in the United States, Excello has sold very little of Monsieur Henri's Dragone Lambrusco. Thus, while Dragone sales between 1977 and 1978 increased from three percent to six percent of Monsieur Henri's total national sales, the corresponding increase in sales of Dragone by Excello was very small. At the same time, Excello distributes over half a dozen other lambruscos and even imports lambrusco itself, which it sells under private labels.

Another alleged instance of failure to promote Monsieur Henri lines was the appearance of an advertisement in Columbus Monthly Magazine which listed many of the

---

1. Monsieur Henri's promotional material for 1979 indicates eleven priority lines, the eight listed in the text and Blanc de Blanc, Fuki and Kirsberry.

wine labels distributed by Excello and its division, Globe Wine and Spirits Company. The ad did not, however, list Monsieur Henri Wines, Ltd. nor any of its labels such as Yago or Weber.

The defendant also alleged that the plaintiff's resistance to Monsieur Henri's marketing philosophy has led to a severe deterioration in the working relationship of the parties. Monsieur Henri's regional manager, Richard Wallace, first visited the offices of Excello in June of 1978 to introduce himself and to discuss a planned advertising campaign in Columbus for the Weber line. When he broached the subject of the Weber promotion he was told flatly by Excello's president Mr. Stanton Robins[2] that the Weber subject would not be discussed because he had been "screwed" by Monsieur Henri before; he added that if Mr. Wallace did not like that, he could take his line and go elsewhere.

The defendant also maintained that Mr. Robins' attitude and actions greatly hampered the introduction of the Premiat line in Columbus. When first approached in 1977 about Premiat (a Rumanian wine), Mr. Robins refused to discuss any "communist bloc" wines. Later, in late May of 1978, Mr. Robins agreed to order two hundred cases.[3] It was explained to him that delivery time would be five months, but he would not increase the order. Premiat was introduced at a show in October of 1978, which Monsieur Henri's district manager, Mr. Schauffler, attended. Nearly half of Excello's Premiat supply was sold at the show, and the remainder was gone in two weeks. Mr. Schauffler managed to obtain some three hundred cases from a New York warehouse, and later diverted a similar amount bound for the Premiat introduction in Michigan. When these supplies were gone, or nearly so, in January of 1979, Excello placed an order for nine hundred cases

of Premiat, which was still less than a full container.

In the fall of 1978, Mr. Wallace and Mr. Robins were both among a group which took a vacation trip to Russia. Mr. Robins testified that some unpleasantness developed between the two men which, although he did not wish to discuss it, was purely personal and had no impact upon the business of Excello and Monsieur Henri. Mr. Wallace testified that, although he was simply another member of the tour, Mr. Robins apparently felt that Mr. Wallace had the responsibility to take special care of him; in fact, however, Mr. Wallace was on his honeymoon trip and he apparently made it clear that he had no responsibility for Mr. Robins' well being. This testimony was neither disputed nor challenged by the plaintiff. Mr. Keith Schauffler, Monsieur Henri's district manager, subsequently testified that Mr. Robins told him that he would prefer not to see "the likes" of Mr. Wallace in Excello's establishment again.

In 1979, the defendant Monsieur Henri's foremost priority was to promote a concept called the "store within a store." This concept sought to present to consumers a display of all of the retail outlet's imported wines, separated in sections designating their country of origin. This concept was very important to the defendant, and in February of 1979 the president, the regional manager and the district manager of Monsieur Henri made a lengthy presentation at Excello, outlining Monsieur Henri's proposals for implementation of the plan. Mr. Stanton Robins was apparently receptive to the concept, and indicated that he would place an order for the eight brands which were featured in the "store within a store."

Some two weeks later, the district manager, Keith Schauffler, returned to Excello. Mr. Robins then placed an order[4] which the

---

**2.** Hereinafter, all references to "Mr. Robins" are to Mr. Stanton Robins.

**3.** A "full container" with which direct importers such as Monsieur Henri usually deal, consists of 1200 cases. Orders of less require a "pool shipment" in which a number of distributors are sold portions of a container. While

pool shipments are apparently not at all unusual, they do apparently involve added delay.

**4.** There was some dispute in the testimony as to whether this was an order or a "proposed" order.

Monsieur Henri representatives believed, and, the Court finds, reasonably believed was wholly insufficient to implement the "store within a store" program. Mr. Schauffler indicated that the order might be too small and that he would check with his superiors to see if it was acceptable.

Shortly thereafter, Mr. Wallace called Excello to verify that the order was as small as it was and that it did not include all of the eight items included in the "store within a store." Mr. Stanton Robins then reiterated[5] that, if Monsieur Henri was unhappy with Excello's actions, they could take their line elsewhere.

On March 20, 1979, Mr. Wallace and Mr. Schauffler delivered a letter to Excello notifying Mr. Robins that Monsieur Henri was taking its line elsewhere by appointing a second distributor since "[y]ou have orally consented to our appointing a second distributor in Columbus." Mr. Robins then told Mr. Wallace that Excello was the "only game in town" and promised in colorful language that Monsieur Henri would never sell another bottle of wine in Columbus.

Shortly thereafter this suit was filed in state court and was removed here. The plaintiff at first sought to enjoin the appointment of a second distributor, but the defendant notified the plaintiff on May 1, 1979 that it would terminate their relationship completely. The plaintiff then amended its complaint and now charges that the termination is without just cause under the Ohio Act.

The termination letter set out the essential reasons for the decision to terminate: (1) the "offensive, antagonistic and embarrassing conduct by" Stanton Robins toward Monsieur Henri's representatives; (2) Excello's failure "to properly represent Monsieur Henri's product line in the Columbus area;" (3) Excello's failure timely to pay its invoices.

### Discussion

■ In determining whether a preliminary injunction should issue to enjoin the termination of the plaintiff's distributorship, the Court must decide four issues in the plaintiff's favor:

(a) Whether the [plaintiff has] shown a strong or substantial likelihood of success on the merits.

(b) Whether the [plaintiff has] shown irreparable injury.

(c) Whether the issuance of a preliminary injunction would cause substantial harm to others.

(d) Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (CA 6, 1977). The requirements are the same under the law of Ohio. *See* 29 Ohio Jurisprudence 2d, *Injunctions*, §§ 33–38. In making these determinations, the Court will deal in turn with the arguments raised by the defendant.

### A. The Contracts Clause

There is no real dispute that the agreement between these parties established an exclusive distributorship for the sale of the defendant's wines in Columbus. There is also no dispute that the agreement predates the passage of the Ohio Alcoholic Beverages Franchise Act, O.R.C. § 1333.82 et seq. The first part of the defendant's argument is that the agreement was terminable at will, and thus any subsequent statutory imposition of a "just cause" for termination requirement impairs the obligation of the contract in violation of the contracts clause of the United States Constitution. *U.S.Const.*, Art. I, § 10.

■ The Court is of the opinion that the twenty-five year oral relationship between the parties in this case had no express term of duration. The Court can give little weight to the statement of Mr. Louis Robins that the distributorship would continue as long as "mutually profitable."

Both of the parties are rational business people. Monsieur Henri's actions indicate that it feels the relationship is no longer profitable to them. If the Court were to hold the defendant to this "profit" standard, it would certainly give that term its broadest economic definition, which would include the concept of opportunity costs.

When a distributorship agreement such as this has no express term, the persuasive authority holds that it is terminable without cause after a reasonable period of existence and upon reasonable notice. *Alpha Distributing Co. of California, Inc. v. Jack Daniel Distillery*, 454 F.2d 442, 448–49 (CA 9, 1972).[6] The reasonable period of existence permits the distributor to recover the additional fixed costs (e. g., capital expenditures) which have been incurred in reliance upon the distributorship agreement. That reasonable period will therefore vary depending upon the facts of the particular case. The plaintiff adduced no evidence to indicate that the twenty-five year life of this relationship was not a reasonable period, nor has it challenged the reasonableness of the sixty day notice of termination. The Court finds that both periods were reasonable.

■ A preliminary question in dealing with the impact of the Ohio Act is whether the Act by its own force applies retroactively as a matter of state law. Section 1.48 of the Ohio Revised Code provides as follows:

A statute is presumed to be prospective in its operation unless expressly made retrospective.

O.R.C. § 1.48. In treating the question of the retroactivity of another Ohio franchise statute, Judge Hogan of this district has stated that

[i]n the absence of any express provision in [the statute] indicating that the legislature intended these statutes to be retrospective, and in the absence of Ohio decisions on this matter, we think that due regard for the statutory presumption requires us to find that [the statute is] prospective in operation and is not therefore applicable in this case.

*Clifford Jacobs Motors, Inc. v. Chrysler Corp.*, 357 F.Supp. 564, 572 (W.D.Ohio 1973). The Court agrees with Judge Hogan's analysis that the "just cause" for termination clause should not be retrospectively applied, and that its application in *Clifford Jacobs*, as here, would be retrospective. *Id.* Nonetheless, while this conclusion is sufficient to dispose of this motion, because it indicates that the plaintiff is unlikely to prevail on the merits, the Court will assume *arguendo* that the statute does apply retrospectively. As will be seen below, this assumption will have no impact on the ultimate disposition of this motion.

■ In determining whether a requirement of "just cause" for termination later imposed upon this agreement by the 1974 Ohio statute is unconstitutional, the Court must find that a substantial impairment of a contractual relationship has occurred and that the state interests proffered are insufficient to justify that impairment. *E. g., Allied Structural Steel v. Spannaus*, 438 U.S. 234, 244–50, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

■ The defendant has cited cases holding that the retroactive imposition of a "just cause" for termination clause violates the contracts clause. *E. g., Globe Liquor Co. v. Four Roses Distillers Co.*, 281 A.2d 19 cert. denied, 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971). The plaintiff has cited numerous cases in which the contracts clause was no bar to certain retrospective legislation, *e. g., Koscot Interplanetary, Inc. v. Draney*, 90 Nev. 450, 530 P.2d 108 (1974), and the plaintiff argues vigorously that the heightened state police powers granted by the twenty-first amendment justify the retrospective application of the Ohio Act to

**6.** The single case cited by the plaintiff for the proposition that this contract is not terminable at will, *McKell v. Chesapeake & Ohio Ry. Co.*, 175 F. 321 (CA 6, 1910), is so inapposite to the case at bar that it does not merit extended treatment. It suffices to say that if that case does stand for the proposition that the plaintiff urges, it was overruled sub silentio in the context of distributorship agreements by *Curtiss Candy Co. v. Silberman*, 45 F.2d 451 (CA 6, 1930).

these parties. While this question is important and interesting, the Court does not choose to reach it:

> Federal courts are courts of limited jurisdiction. They have the authority to adjudicate specific controversies between adverse litigants over which and over whom they have jurisdiction. In the exercise of that authority, they have a duty to decide constitutional questions when necessary to dispose of the litigation before them. But they have an equally strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration.

*County Court of Ulster County, New York v. Allen,* —— U.S. ——, ——, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979). Because the Court can dispose of this controversy on the basis of state law without reaching the constitutional question, the Court is of the opinion that, in this case, the wiser course is to do so.

*B. Just Cause for Termination*

The Ohio Alcoholic Beverages Franchise Act, O.R.C. § 1333.82 et seq. has two provisions which speak expressly to termination of a franchise agreement. Section 1333.84 provides that

> Notwithstanding the terms of any franchise, no manufacturer or distributor engaged in the sale and distribution of alcoholic beverages, or a subsidiary of any such manufacturer, shall:
>
> > (A) Fail to act in good faith or without just cause in acting or purporting to act under the terms of a franchise or in cancelling or failing to renew a franchise.[7]

Section 1333.85 provides that

> No manufacturer or distributor shall cancel or fail to renew a franchise . . . for other than just cause and without at least sixty days' written notice to the other party setting forth the reasons for such cancellation . . . . .

■ The use of the phrase "good faith *or* . . . just cause" in § 1333.84 juxtaposed with simply "just cause" in the following section raises the question of whether "good faith" and "just cause" are coterminous, or whether "good faith" could describe a situation where just cause did not exist, but the party who cancels still acts in good faith. This problem is academic, however, because the Court finds on the record before it that the defendant acted both in good faith and with just cause in terminating its distributorship with the plaintiff.

The definition of good faith in the Alcoholic Beverages Franchise Act, like the definitions of good faith in Ohio's Automobile Dealer Franchise Act, O.R.C. § 1333.71 et seq., and the federal Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 et seq., focuses upon coercion and intimidation of one party by the other, accomplished by express or implied threats of termination. It is clear on this record that the only party guilty of intimidation in this relationship was Excello, whose president often rejected summarily or even refused to discuss Monsieur Henri's business objectives with the comment that *if* Monsieur Henri was at all dissatisfied, the line could be taken to another distributor. There was no lack of good faith on the part of Monsieur Henri in this case. Its representatives' calculated business judgment was that Monsieur Henri's best interests were no longer being served by the distributorship with Excello.

The Court is also of the opinion that just cause existed for the termination. Mr. Louis Robins testified that he had only been contacted once with regard to late payments; he later changed that number to "two or three" times. The defendant adduced evidence that over twenty contacts had been made. It appears that many pay-

---

7. Section 1333.82 of the Act defines "good faith" as

   > . . . the duty of any party to any franchise, and all officers, employees, or agents thereof, to act in a fair and equitable manner toward each other so as to guarantee each

   party freedom from coercion or intimidation; except that recommendation, endorsement, exposition, persuasion, urging, or argument shall not be deemed to constitute a lack of good faith or coercion.

ments were unquestionably late, even calculated on a longer time period than the defendant's usual thirty day terms.

While late payments, standing alone, might not be an overwhelming cause for terminating a twenty-five year relationship, they do not stand alone. The antagonistic and even truculent attitude of Excello's president, with its corresponding impact upon the business dealings of Excello with Monsieur Henri's representatives, made the defendant's position, as they described it, "untenable." The unpublished Ohio cases which the plaintiff supplied to the Court prior to the hearing demonstrate the type of coercive over-reaching which § 1333.85 seeks to prevent. This case is clearly not an instance of cancellation for no reason and without notice, or for a reason wholly unrelated to the business relationship of the parties.

Finally, and most importantly to this Court, there developed between these parties a fundamental conflict in business philosophy. They each formed a judgment concerning what was the best manner in which to market the defendant's wines. Those judgments conflicted. The defendant faced a severe problem in that it was completely foreclosed from selling many of its wine labels in the Columbus area as long as its exclusive representative, the plaintiff, did not attempt to distribute those labels.

The plaintiff has not addressed the question of what constitutes just cause under the Act, and whether such cause existed here. The plaintiff seems to believe, however, that as long as its sales of Yago and Weber do not fall, the distributorship can never end. The Court disagrees. The Ohio Act does not require business people to act irrationally or counter to their best interest. It in no way promotes the state's "three tier" system of wine and beer distribution to require a particular distributor to deal with a particular supplier despite irreconcilable conflicts in marketing philosophies. The defendant has concluded that it must sell more than two or three of its labels in Columbus, and that a distributor with the unusual market power of Excello should be

able to do so, or should be at least willing to try to do so. The defendant is willing to go to a less powerful distributor in order to get adequate representation for more of its labels, despite the risk of a short term decline in the sale of Yago and Weber. The Court cannot second-guess that judgment, and the Ohio Act does not require it to do so. The Court finds that the plaintiff has failed to demonstrate any likelihood of success on the merits of his claim that the Ohio Act proscribes this termination.

## C. Irreparable Harm

The defendant argues persuasively that the plaintiff has failed to show any harm not compensable by money damages. The fact that a bottle or type of wine is unique does not mean that the loss of the right to sell that wine causes unmeasurable harm. The Ohio Wine Book shows ample statistics of the amount of sales of Monsieur Henri wines historically made by the plaintiff and also shows sales of the same labels by other Ohio distributors.

There was also testimony that consumer purchasing choices are made solely on the basis of labels, the name of the supplier and distributor being irrelevant. Since Monsieur Henri wines represent a very small fraction of Excello's sales, it is doubtful that any relationships with retail outlets would be impaired. The Court nonetheless finds it unnecessary to decide this question because of its conclusion that the termination decision was made for just cause.

### Conclusions of Law

The Court has jurisdiction of this action under the provisions of 28 U.S.C. §§ 1332(a) and 1441(a).

The plaintiffs have failed to demonstrate a strong or substantial likelihood or probability of success on the merits of its claim that the termination of its distributorship agreement with the defendant violates Ohio law.

Granting a preliminary injunction would cause at least as much harm to the defendant as the failure to grant an injunction will cause to the plaintiff.

Granting a preliminary injunction will not serve the public interest.

WHEREUPON, the Court determines that the motion for a preliminary injunction is without merit and it is therefore DENIED.

IT IS SO ORDERED.