R.L.M. DIST. CO., Plaintiff,

v.

W.A. TAYLOR, INC., a New York
Corporation, Defendant.

No. CIV 87–1637 PHX RGS.

United States District Court,
D. Arizona.

Jan. 4, 1988.

Andrew L. Pringle, Phoenix, Ariz., for
plaintiff.

Victoria S. Lewis, Phoenix, Ariz., for defendant.

## ORDER

STRAND, District Judge.

### INTRODUCTION

This is a distributor termination action in which plaintiff R.L.M. Dist. Co. ("RLM") alleges that the announced termination by defendant W.A. Taylor & Company ("Taylor") of RLM's appointment to distribute Taylor's spirituous liquor products in Arizona is in violation of Arizona statutory and common law. In response to RLM's request for a preliminary injunction enjoining Taylor from terminating RLM's appointment during the pendency of this litigation, the court accelerated the trial on the merits with respect to the injunction claims of Counts Four and Five of RLM's complaint. Count Five of the complaint alleges the Taylor's actions violated the Arizona Spirituous Liquor Franchises Act, A.R.S. § 44–1565 *et seq.* ("Act"). Count Four alleges that Taylor breached its contractual obligations of good faith and fair

dealing, under both common law and the Act, in terminating RLM's appointment.

The limited issue that is to be decided by the court is whether RLM is entitled to an injunction barring Taylor from terminating RLM as the distributor of W.A. Taylor products in Arizona.

This action was originally filed in the Superior Court of the State of Arizona in and for the County of Maricopa. Taylor removed the action to this court pursuant to 28 U.S.C. § 1441, on grounds that there exists complete diversity of citizenship between RLM and Taylor and the amount in controversy exceeds $10,000.00 exclusive of interest and costs.

## FINDINGS OF FACT

### THE PARTIES JOINT PRETRIAL ORDER

The parties have admitted in their joint pretrial order that:

—RLM is an Arizona corporation with its principal place of business in Phoenix, Arizona.

—Taylor is a New York corporation with its principal place of business in Miami, Florida.

—RLM is engaged in the wholesale wine and spirits business throughout the State of Arizona.

—Taylor is an importer and marketer of distilled spirits and is a subsidiary of Hiram–Walker–Gooderham & Worts Limited.

—The term "Taylor products" means Courvoisier cognac, Drambuie and Tia Maria liqueurs, Old Smuggler scotch, Makers Mark bourbon and Booth's gin.

—RLM became a distributor of Taylor products in Arizona as of August 1, 1985, following the acquisition by R.L.M. of the assets and liabilities of Taylor's former distributor in Arizona known as All American Distributing Co., Inc.

—Taylor agreed to accept RLM as a distributor of Taylor products in Arizona as of August 1, 1985.

—There was no written distributorship or franchise agreement between RLM and Taylor as of August 1, 1985, or at any time thereafter.

—On or about August 11, 1987, Taylor gave written notice to RLM that RLM's distributorship with respect to Taylor products in Arizona would be terminated "within ninety days."

—On or about September 17, 1987, Taylor appointed McKesson Wine and Spirits, Inc. as a distributor of Taylor products in Arizona.

—RLM distributes the products of approximately 40 suppliers in addition to Taylor.

### ADDITIONAL FINDINGS OF FACT

1. Taylor has written distribution agreements with a majority of the wholesalers with whom it does business in the United States. Taylor had a written distribution agreement with All American Distribution Co. prior to the sale of that company to RLM. No written distribution agreement was offered to RLM at the time it became a Taylor distributor in Arizona, and there has been no written distributorship or franchise agreement between RLM and Taylor at any time thereafter.

2. In addition to Taylor, RLM represents some 40 different suppliers, including Joseph E. Seagram & Sons, Inc. ("Seagram") and Schenley Industries, Inc. ("Schenley"). Approximately 94 percent of RLM's business by dollar value—and approximately 97 percent by case volume—derives from suppliers other than W.A. Taylor.

3. On August 11, 1987 Taylor gave written notice to RLM that RLM's distributorship with respect to Taylor products would be terminated in ninety days. This date was suspended by the court's order dated November 19, 1987.

4. RLM acknowledges that the Taylor products alone account for only about six (6) percent of RLM's annual revenue. However, RLM believes that the Taylor products create additional revenue through their ability to "open doors" and attract sales of other products.

5. RLM's owner, Mr. Matteucci, purchased All American from its prior owner

on August 1, 1985. Before doing so he and All American's then-president, Mr. Bernard Gellerman, met with Taylor's president, Mr. John Harcarufka, and other Taylor officials at a trade association meeting of the Wine & Spirits Wholesalers Association ("WSWA") in late April or early May 1985.

6. At the 1985 WSWA meeting Mr. Matteucci described his plans for RLM's prospective distribution business in Arizona in an effort to persuade Mr. Harcarufka to keep W.A. Taylor's business with RLM after the purchase of All American. Mr. Matteucci made several representations to Mr. Harcarufka at this time, which were confirmed by a letter from Mr. Matteucci to Mr. Harcarufka dated May 14, 1985.

7. In this letter Mr. Matteucci told Mr. Harcarufka that RLM would retain Mr. Gellerman in his present capacity, would maintain two chain divisions within RLM and that Taylor products would do better than they ever had done before.

8. There was no discussion of transferability or any other terms or conditions that would be included or observed in the distribution relationship if Taylor chose to appoint RLM as its Arizona distributor.

9. No decision was made by Mr. Harcarufka at the 1985 WSWA meeting as to the appointment or non-appointment of RLM. Mr. Matteucci left the meeting believing only that he had not received Taylor's "non-consent" to the appointment.

10. Custom and practice in the spiritous liquor industry provides in the absence of a specific agreement to the contrary, that a Wholesaler may transfer distribution rights to a third party with the consent of the supplier.

11. Mr. Harcarufka visited the Arizona market in May 1985, and met with a number of wholesalers including McKesson. He was impressed with what he saw and concluded that Taylor had a number of good options for distribution in Arizona.

12. Throughout the period of RLM's distributorship, W.A. Taylor maintained direct contact with RLM through Taylor's local representative in Arizona, Mr. Nelson Wandrey. Mr. Wandrey's duties included monitoring the Arizona market to see that Taylor's products were being effectively distributed, meeting regularly with RLM to develop programs and to improve performance, and developing ways to motivate the wholesaler to pay due attention to the distribution of W.A. Taylor products.

13. W.A. Taylor's chief concern in its meetings with each of its distributors, including RLM, was to motivate the wholesaler to provide the broadest and most effective practicable distribution of W.A. Taylor brands. One of Mr. Wandrey's consistent themes was to encourage RLM to expand distribution of Taylor products to larger numbers of on-premise and off-premise retail locations.

14. Within each retail outlet RLM was responsible to assure the Taylor products were favorably presented to the public. This latter responsibility involved working with the retailers to assure that W.A. Taylor products received an appropriate number of facings and "eye level" shelf space wherever possible, and to assure that the pricing of Taylor products was in line with the competition.

15. Taylor held regular six-month planning sessions with its distributors, including RLM. At these sessions, Taylor established sales targets, called "quotas," for the next six months.

16. At these six-month planning sessions, Taylor would also discuss past sales performance and upcoming promotions with a distributor. In RLM's case, these sessions were attended only by Mr. Bowles and/or Mr. Wandrey for Taylor.

17. Mr. Wandrey critiqued RLM directly for its performance in a number of respects, including: (1) RLM's distribution of Tia Maria, Drambui, and small sizes of most Taylor products; (2) number of displays; (3) on premise distribution in top restaurants; (4) numbers of "pours" of Smuggler's scotch and Booth's gin; and (5) whether products such as V.S.O.P., Napolean, X.O. and Makers Mark were being carried by bars. Mr. Wandry also attended meetings with RLM on a regular basis, conducted surveys of the marketplace and

discussed with RLM areas in which improvements should be made.

18. Mr. Matteucci twice reorganized RLM. After his acquisition of All American, Mr. Matteucci created two divisions as stated in his May 14, 1985 letter, but he did so in a manner that placed Seagram (a Taylor competitor) as the dominant supplier in one division, while nearly all the remaining spirits suppliers, including Taylor, were placed together in the other division, where none had special prominance. Later in mid–1986, after the departure of Mr. Gellerman from RLM, Mr. Matteucci reorganized the spirits sales force in a fashion that was designed to collapse the spirits sales of the two divisions into one unified group. Thereafter, each of RLM's spirit salesmen sold all of the distilled spirits products distributed by both divisions. This further reduced the prominance and the attention W.A. Taylor received as a RLM supplier, since Taylor products were being sold by RLM's salesmen indistinguishably with the products of Seagram, Schenley and others, some of which compete with Taylor products.

19. RLM's sales or "depletion" figures reflect a downturn over the years 1984–1986 as follows:

| | Total Taylor AZ Depletions |
|---|---|
| 1984 | 23,833 |
| 1985 | 21,446 |
| 1986 | 17,777 |

20. Contrary to the expectations expressed in Mr. Matteucci's May 14, 1985 letter to Mr. Harcarufka, RLM's sales or "depletion" figures for W.A. Taylor products reflect a downward trend over the years 1984–1986.

21. The increase in drinking age, the 20 percent increase in the Federal Excise Tax in late 1985 and more restrictive laws relating to the sale of liquor and liquor related offenses, explains, in part, the reason for this downturn in sales.

22. Mr. Bowles, the Southwest Division Manager of Taylor, received regular telephone reports and written monthly marketing reports on the Arizona market from Mr. Wandrey. He also regularly conducted field surveys in Arizona.

23. Mr. Bowles met with RLM's then sales manager, Mr. Gellerman to discuss a survey he made in Arizona on or about April 9, 1986. He communicated to Mr. Gellerman his disappointment with the Arizona market, especially on premise distribution of Makers Mark bourbon, Courvoisier V.S.O.P. cognac, Booth's gin and Old Smuggler's scotch.

24. Mssrs. Bowles, Wandrey and Harcarufka based on their observations of RLM's performance were dissatisfied with RLM's performance.

25. Taylor considered RLM's distribution of Taylor products to be on a trial basis. RLM felt it was on a permanent distributorship basis.

26. When RLM purchased All American in August 1985, Mr. Harcarufka decided that Taylor would appoint RLM as its Arizona distributor on a trial basis.

27. Taylor's top management expressed its concern about RLM's performance in September 1986 at the time when Mr. Wandrey reported in detail that RLM's sales force reorganizations had deviated from RLM's representations to Taylor. Mr. Harcarufka felt this deviation would deprive Taylor of the attention and prominence it had expected.

28. Taylor was put on notice by Mr. Wandrey's September 22, 1986 Arizona update which concluded that RLM's position as a distributor had "deteriorated." Mr. Wandrey recommended that a second or "dual" distributor be appointed promptly and that RLM be removed entirely by February 1987, following the Christmas selling season.

29. After receiving the Wandry report, Mr. Harcarufka flew to the Arizona market to see conditions for himself. Joined there by Mssrs. Wandrey and Bowles, Mr. Harcarufka spent a day and a half surveying Taylor's distribution in the market. They visited a cross section of retail outlets and interviewed retailers. Mr. Harcarufka's personal examination of the marketplace revealed to Mr. Harcarufka what he considered severe deficiencies in RLM's distribution of Taylor products, including pricing

problems, inadequate facings and shelf position, and poor or no distribution either of brands or of particular sizes of brands.

30. Mr. Harcarufka communicated his dissatisfaction personally to Mr. Matteucci at the end of his September visit. He then returned to Taylor's Miami headquarters and instructed Mr. Levine to follow up with Mr. Matteucci.

31. Mr. Levine met with Mr. Matteucci in early November 1986 in Miami, and expressed concerns about the distribution of Taylor's products in Arizona. Mr. Levine also reviewed with Mr. Matteucci data regarding RLM's sales against quota in the two most recent planning documents: one showing RLM's performance against quota for the last six-month segment, March to August 1986, and the second showing agreed upon quotas for the partially completed period September 1986 to February 1987. The completed six-month planning document showed that RLM had failed to meet its quotas on five of six Taylor brands.

32. Prior to RLM's termination by Taylor, Taylor never threatened termination of RLM, nonetheless, Messrs. Harcarufka and Levine gave notice to Mr. Matteucci in unequivocal terms that Taylor's top management was dissatisfied with important aspects of RLM's performance.

33. Mr. Harcarufka made his decision to terminate RLM's distributorship for three primary reasons: (1) Mr. Matteucci's failure to satisfy his representations in his May 1985 letter; (2) the deficiencies in RLM's distribution of Taylor products as reflected in Mr. Harcarufka's September 1986 market survey; and (3) dissatisfaction with RLM's sales results.

34. Mr. Harcarufka's conclusions as to poor sales results for the calendar year 1986 were confirmed by RLM's sales against quota for the six-month period September 1986 through February 1987. During this period RLM failed to meet any of the quotas for the six Taylor brands.

35. Following Taylor's decision, Mr. Levine was sent to Arizona to determine the availability of a replacement distributor. Mr. Levine went to Phoenix in May 1987 and, after reviewing the market, selected McKesson, a wholesaler that also carried the products of Taylors's two sister companies: Hiram Walker, Inc., and Maidstone Wine & Spirits.

36. The opportunity to consolidate Taylor's Arizona distribution with two sister companies was believed by Mr. Harcarufka to be a significant advantage. The primary benefit was to increase the attention and prominence which Taylor would have in dealings with its distributor, and thus to remedy the problem that Taylor had faced in this respect during the RLM distributorship.

37. In his decision to consolidate forces with Taylor's two sister companies, Mr. Harcarufka was following a mandate from the Hiram Walker parent company that consolidation was to be implemented wherever practicable and consistent with the marketing goals of Taylor and the other two companies.

38. There is a difference in marketing philosophy between Taylor and RLM. The evidence indicated that RLM's approach and greatest strength is in making large volume sales to retail chain store accounts. Accordingly, plaintiff's proof at trial emphasized claims that Arizona is a chain store market, that a substantial portion of overall wine and spirits sales are made to chain stores, and that RLM was relatively successful in serving the chain store trade, primarily through discount pricing. In contrast, Taylor believes that its products are premium-priced "prestige" brands that cannot be effectively marketed over the long-run by emphasizing sales to chains. Rather, the evidence showed that Taylor feels its sales will grow over the long term only through a strong emphasis on brand building at on-premise establishments—such as restaurants, hotels and resorts—where the products' quality image can be enhanced and consumer demand stimulated.

### ISSUES BEFORE THE COURT

1. Has the relationship between RLM and Taylor been a "franchise" subject to

the Arizona Spiritous Liquor Franchises Act?

2. If the Act applies, was Taylor's announced termination of RLM as a distributor of Taylor products in Arizona based upon "good cause" within the meaning of A.R.S. § 44–1565(2)?

3. If the Act applies, was Taylor's announced termination of RLM as a distributor of Taylor products in Arizona done in "good faith" within the meaning of A.R.S. § 44–1565(3) and Arizona law?

4. Was Taylor's announced termination of RLM as the distributor of Taylor products in Arizona a violation of Taylor's implied covenants of good faith and fair dealing which were part of its distributorship agreement with RLM under Arizona law?

5. Is RLM entitled to an injunction enjoining Taylor from terminating RLM as Taylor's distributor of Taylor products in Arizona?

## CONCLUSIONS OF LAW

### THE RELATIONSHIP BETWEEN RLM AND TAYLOR IS SUBJECT TO THE ARIZONA SPIRITUOUS LIQUOR FRANCHISES ACT

■ The Arizona Spiritous Liquor Franchises Act, § 44–1565, *inter alia*, states:

(1) "Franchise" means a commercial relationship between a supplier and a wholesaler which includes all of the following:

(a) A commercial relationship of definite duration or continuing indefinite duration is involved.

(b) The Wholesaler is granted the right to offer, sell and distribute within the state or any designated territory such of the supplier's brands of spirituous liquors as may be agreed upon. The requirements of this paragraph are not intended to preclude a supplier from establishing more than one commercial relationship of any kind within or with relation to activity in this state or any designated territory therein not in violation of article 1 of this chapter.[1]

(c) An agreement relating to transferability of the commercial agreement.

For the Arizona Spiritous Liquor Franchises Act, A.R.S. § 44–1565, to apply, the three prerequisites listed above must be met. The parties to this litigation agree that the first two elements have been met, however, they disagree as to the third element.

The third element in the Act's definition of "franchise" requires "an agreement relating to transferability of the commercial relationship." This element is not found in any other state statute regarding alcoholic beverage franchises. The parties both acknowledge that there was no express agreement, either written or oral, relating to the transferability of their commercial relationship. RLM contends that there was an implied agreement between the parties concerning transferability which arose by virtue of the custom and practice relating to transferability that exists within the liquor industry.

Basic contract law does not require that agreements be made exclusively through verbal or written communications. Contracts may be implied in whole or in part through conduct alone or through usage of trade. *See Cook v. Cook,* 142 Ariz. 573, 691 P.2d 664 (1984); *Restatement (Second) Contracts* § 4, comment a; *Id.* § 5 comment a; 1 *Corbin on Contracts* § 18 (1963). Therefore, even though RLM and Taylor never discussed the issue of transferability, an implied agreement concerning this subject may arise in the absence of a specific agreement to the contrary if custom or practice in the industry provides for such an understanding.

In the present case, the evidence at trial established that while spirituous liquor suppliers and distributors often do not discuss, orally or in writing, the terms of their transfer rights, the custom in the industry is that distribution rights may be transferred, with the consent of the supplier, upon sale of the distributor's business or transfer of the business.

---

1. Section 44–1401 et seq.

The court finds and concludes that custom and practice in the industry and the course of conduct between RLM and Taylor was sufficient to imply an agreement between the parties relating to transferability within the meaning of A.R.S. § 44–1565(1)(c). For this reason, the court finds that the Arizona Spirituous Liquor Franchises Act applies in the instant case.

Because the Act applies the court must determine if Taylor acted with "good cause" and in "good faith," within the meaning of the Act, in terminating RLM.

## RLM WAS TERMINATED FOR "GOOD CAUSE" UNDER THE ACT

█ The court concludes that Taylor's termination of RLM as a distributor of Taylor products in Arizona was based upon "good cause" within the meaning of A.R.S. § 44–1565(2).

Under the Arizona Franchises Act, A.R.S. § 44–1565(2), "good cause" means:

> ... failure by the supplier or the wholesaler to comply with the provisions of an agreement as delineated therein, which provisions are not unconscionable.

Because there is no case law interpreting the definition of "good cause" under the Arizona statute, the court must look to the language of the statute itself and to cases from other jurisdictions which interpret statutes similar to the Arizona Act.[2]

The case of *State Distributors, Inc. v. Glenmore Distillers Co.*, 738 F.2d 405 (10th Cir.1984), involved the interpretation of a similar spirituous liquor franchises statute. In *Glenmore* a wholesaler of alcoholic beverages brought action against a supplier, alleging violation of the New Mexico Alcohol Beverage Franchise Act. The New Mexico Act applies explicitly to the relationship between alcohol suppliers and distributors and similar to the Arizona statute in question defines "good cause" as "the failure by the wholesaler (distributor) to substantially comply with the essential and reasonable provisions of the agreement or understanding with the supplier," as

well as "bad faith on the part of the wholesaler in carrying out the terms of the agreement."[3] *Glenmore* at 413.

In *Glenmore*, the Tenth Circuit, as is the case here, did not have the advantage either of legislative history or of an authoritative state court interpretation of the statute. For that reason, the court of appeals construed the New Mexico Act in light of the federal Dealer Day in Court Act, 15 U.S.C. § 1221 et seq. (1982). *Id.* at 413. In light of both statutes, the court of appeals held that a narrow and rigid interpretation of "good cause" was inappropriate because it would force suppliers and distributors to remain shackled together in unsatisfactory relationships. The *Glenmore* court stated:

> The [New Mexico] Franchise Act is not to be read as forcing a particular supplier and distributor to deal with one another despite irreconcilable conflicts in marketing philosophies, nor can it be read so as to require the court to second guess the business judgment of the supplier in terminating such a franchise. *See Excello Wine Co. v. Monsieur Henri Wines, Ltd.*, 474 F.Supp. 203, 210 (S.D.Ohio 1979). The supplier is not precluded from dealing firmly but fairly with the distributor in order to protect the survival of its business and protect its investment. *Kolb v. Chrysler Corporation*, 661 F.2d 1137, 1140 (7th Cir.1981).

*Glenmore*, 738 F.2d at 413.

In *Glenmore*, the court found that the distributor "consistently failed to meet sales expectations, followed a marketing philosophy contrary to that of Glenmore [the supplier], failed to take sufficient steps, as promised, to improve its performance, and in Glenmore's business judgment failed to adequately represent its product in New Mexico." *Id.* at 413–414.

The court here finds and concludes that the Tenth Circuit's interpretation of the New Mexico statute's "good cause" definition is the proper interpretation to apply to

2. *See* Fine, "Recent developments in State Law Affecting Franchising," 1980 Ariz.St.L.J. 547, 558.

3. N.M.Stat.Ann. § 60–8A–7(B).

the Arizona statute's "good cause" definition.

In the instant case, the Arizona Act, like the New Mexico Act does not expressly prohibit a valid business justification as a basis for good cause. Like the Tenth Circuit, this court has no Legislative history to guide its interpretation of the good cause provision. Further, as the Tenth Circuit held, it would be wrong in these circumstances "to second-guess the business judgment of the supplier in terminating such a franchise." *Glenmore*, 738 F.2d at 413.

In the present case, the evidence at trial demonstrated that the statutory "good cause" standard was met.

First, Taylor was entitled to terminate RLM based upon poor sales performance. Poor sales performance in violation of an understanding between a supplier and distributor has been held to constitute good cause for termination under similar statutes. *See L–O Distributors, Inc. v. Speed Queen Co.*, 611 F.Supp. 1569, 1570–73, 1580 (D.C.Minn.1985). Poor sales performance was shown by the inadequate distribution of Taylor products observed by Mr. Harcarufka in September 1986, by the downturn in RLM's 1986 sales, and by RLM's failure to meet 11 of 12 sales quotas during the period March 1986 to February 1987.

Second, good cause exists where there is an irreconcilable difference in marketing philosophy between the supplier and its distributors. *Glenmore*, 738 F.2d at 413. Such an irreconcilable difference existed as RLM's emphasis was on large volume sales to retail chain stores and Taylor's emphasis on longer-term brand building through distribution at on-premise accounts.

Third, RLM reorganized its sales force contrary to representations it made to Taylor concerning how it would be organized.

Based on the above, the court finds and concludes that Taylor had "good cause" to terminate RLM's distribution arrangement.

## RLM WAS TERMINATED IN "GOOD FAITH" UNDER THE ACT

Taylor's termination of RLM was made in "good faith" within the meaning of A.R.S. § 44–1565(3). Section 44–1565(3) states:

> "Good faith" means the duty of each party to any franchise and all officers, employees or agents thereof to act in a fair and equitable manner in carrying out the agreement.

The evidence at trial indicated that Taylor dealt in a fair and equitable manner with RLM. Taylor acted on the basis of reasonable commercial concerns which were communicated to RLM. This is demonstrated by the fact that Taylor only terminated RLM after Taylor set specific sales goals for RLM which RLM did not meet, after Taylor criticized RLM's market penetration and overall performance, and after Taylor through Mr. Harcarufka and Mr. Levine's warnings in September and November 1986 put RLM on notice of its failings. Further, Taylor acted in accordance with a neutral business judgment that its distributional system in Arizona should be consolidated with that of another Hiram Walker company.

Based on the above the court finds and concludes that Taylor acted in "good faith," within the meaning of the act, in terminating RLM as its distributor in Arizona.

## TAYLOR'S TERMINATION OF RLM DID NOT VIOLATE ARIZONA'S IMPLIED COVENANTS OF GOOD FAITH AND FAIR DEALING

It is well established under Arizona law that a party to a contract has an implied obligation of good faith and fair dealing. *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565, 569 (1986).

In this case, there was no evidence of bad faith, unequal bargaining power or a fiduciary relationship between the parties. Taylor did not act arbitrarily or capriciously, it had legitimate business reasons for terminating RLM, *See American Mart Corp. v. Seagram & Sons, Inc.*, 643 F.Supp. 44, 48 (D.Nev.1985) *aff'd*, 824 F.2d 733, 734 (9th Cir.1987), and gave RLM ample notice of the date of termination.

RLM feels the good faith requirement was breached because RLM and Tay-

lor were in a fiduciary relationship. Only a minority of courts consider franchise relationships to be fiduciary. *See Power Motive Corp. v. Mannesmann Demag Corp.*, 617 F.Supp. 1048, 1051 (D.Colo.1985) (noting minority viewpoint); *Picture Lake Campground, Inc. v. Holiday Inns.*, 497 F.Supp. 858, 869 (E.D.Va.1980). Many cases have held that franchise relationships are not fiduciary. *See e.g., Boat & Motor Mart v. Sea Ray Boats, Inc.*, 825 F.2d 1285 (9th Cir.1987) (California law); *Jack Walters & Sons Corp. v. Morton Buildings, Inc.*, 737 F.2d 698 (7th Cir.1984) (Wisconsin law); *Domed Stadium Hotel, Inc. v. Holiday Inns*, 732 F.2d 480 (5th Cir.1984) (Louisiana law). Since there is no evidence that either party relied on the existence of any fiduciary duties in its dealings with the other and because Arizona's courts have never decided whether a franchise relationship is fiduciary, this court does not find a fiduciary relationship present.

As to the notice of termination Taylor gave RLM, the 90 day notice period Taylor gave RLM was reasonable. *See Millett Co. v. Park & Tilford Distillers Corp.*, 123 F.Supp. 484 (N.D.Cal.1954) (where an agreement was silent as to termination, it was terminable at will on 90–days' notice); *Excello Wine Co. v. Monsieur Henri Wines, Ltd.*, 474 F.Supp. 203 (S.D.Ohio 1979) (60–days' notice reasonable under Ohio franchise law).

Based on the above, the court finds and concludes that Taylor's conduct was not unfair, inequitable or unreasonable. The court also concludes that Taylor acted in good faith in terminating RLM, that there was no fiduciary relationship between the parties and that Taylor had legitimate business reasons for terminating RLM. Further, the court concludes that the 90 day notice of termination period given to RLM was adequate and reasonable.

Based on the foregoing,

IT IS ORDERED denying plaintiff's request for injunctive relief.

IT IS FURTHER ORDERED that the temporary restraining order heretofore issued by the court in this action is hereby dissolved.