991 F.2d 787
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Larry BRITTAIN; Fred C. Hitchcock; H. Dean Proctor; Ted
Proctor, Plaintiffs-Appellants,
v.
THE STROH BREWERY COMPANY, Defendant-Appellee.
 No. 92-1645.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 4, 1993
Decided: April 26, 1993
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. William L. Osteen, Sr., District Judge. (CA-90-30-G)
 Clinton Eudy, Jr., ADAMS, KLEEMEIER, HAGAN, HANNAH & FOUTS, Greensboro, North Carolina, for Appellants.
 Mark Nixon Poovey, WOMBLE, CARLYLE, SANDRIDGE & RICE, Winston-Salem, North Carolina, for Appellee.
 Amiel J. Rossabi, R. Harper Heckman, ADAMS, KLEEMEIER, HAGAN, HANNAH & FOUTS, Greensboro, North Carolina, for Appellants.
 Jeffrey R. McFadden, Timothy A. Thelen, WOMBLE, CARLYLE, SANDRIDGE & RICE, Winston-Salem, North Carolina, for Appellee.
 M.D.N.C.
 AFFIRMED.
 Before WILKINS and LUTTIG, Circuit Judges, and PAYNE, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Plaintiffs-appellants are former shareholders (the"shareholders") of Mark IV Beverage, Inc. ("Mark IV"), a beer wholesaler in Greensboro, North Carolina. They appeal from a judgment granting Stroh Brewery Company's ("Stroh") motion for summary judgment on their claim that Stroh breached its Wholesaler Agreement with Mark IV by refusing to approve a proposed sale of Mark IV. We affirm.
 
 BACKGROUND
 
 2
 As found by the district court, the relevant undisputed facts are as follows. In March 1984, Stroh and Mark IV entered into a Wholesaler Agreement ("Agreement") giving Mark IV the exclusive right to distribute Stroh brands in Greensboro and the surrounding counties. Section 3 of the Agreement defined it to be a personal service contract, which depended on, among other things, the wholesaler's "dedication" and "commitment" to selling Stroh brands.[1]
 
 
 3
 Section 5 of the Agreement governed the rights and obligations of the parties in the event of changes in the ownership or control of Mark IV. Under that section, Mark IV agreed to notify Stroh in writing of any proposed "control change" and to obtain Stroh's approval of that change. Stroh, in turn, agreed not to unreasonably withhold approval of a proposed control change, but reserved the right to disapprove a control change if, in good faith, it believed the change to be adverse to its overall business interests in the wholesaler's territory.[2]
 
 
 4
 As a result of changing market conditions and Stroh's 1982 acquisition of the Schlitz Brewing Company, Stroh developed a consolidation policy in December 1985 to encourage Stroh wholesalers whose overall market strength was weak to consolidate with other Stroh brands distributors. After learning of this policy, the shareholders and Joe Lillard, who also owned stock in Mark IV, evaluated Mark IV's market position and resolved to sell the distributorship.
 
 
 5
 In October 1986, Lillard, acting on behalf of Mark IV, met with I.H. Caffey, president of I.H. Caffey Distributing Company, Inc.
 
 
 6
 ("Caffey Distributing"), to discuss the possible sale of Mark IV. Caffey Distributing was a large volume wholesaler in the Greensboro and Winston-Salem area but it distributed primarily Miller Brewing Company brands. Miller is a direct competitor of Stroh nationally and in North Carolina. The parties eventually entered into a Purchase Agreement whereby Caffey Distributing agreed to purchase, among other things, Mark IV's brand distribution rights, including the right to sell Stroh brands. Because this transaction constituted a control change under the Agreement, Mark IV notified Stroh of the proposed sale and requested Stroh to approve it.
 
 
 7
 As part of its review of Caffey Distributing, Stroh sent Paul Siddle, Stroh's North Carolina state manager, to interview Mr. Caffey on November 12, 1986. By all accounts, the meeting was contentious. The parties do not dispute that, during the meeting, Mr. Caffey told Siddle that he was "not begging for the Stroh's brands"; that without the Stroh brands he would "still make [his] million a year"; that he "was doing Stroh's a favor" by taking the distributorship; that he had "run off" several Miller representatives; and that he did not always cooperate with Miller. After the interview, Siddle sent a memorandum to his superiors summarizing the substance of the meeting and describing Mr. Caffey's attitude.
 
 
 8
 Although Caffey Distributing subsequently sent Stroh a proposed marketing plan and information describing Caffey Distributing's financial picture in positive terms, Stroh decided not to approve the sale to Caffey Distributing and so notified Mark IV by letter dated December 4, 1986. The bases for this decision were (i) the interview with Mr. Caffey, which raised serious concerns about Caffey Distributing's dedication to Stroh brands; (ii) Caffey Distributing's position as a large volume Miller seller and the attendant fears of sales dilution, which were exacerbated by Mr. Caffey's apparently antagonistic attitude; and (iii) to a lesser extent, Stroh's consolidation policy, which would be furthered if Mark IV were sold to another Stroh distributor. Accordingly, the sale to Caffey Distributing was never consummated. On August 12, 1988, Stroh approved the sale of Mark IV to Lillard, who merged it into his existing beer distributorship and continued doing business as Mark IV.
 
 
 9
 The shareholders thereafter commenced the underlying action against Stroh in state court, claiming that Stroh had breached the Agreement by unreasonably withholding its approval of the proposed sale to Caffey Distributing. The shareholders alleged that they received less money on the sale to Lillard than they would have received on the sale to Caffey Distributing, and sought damages for the difference.
 
 
 10
 Stroh subsequently removed this diversity action to the United States District Court for the Middle District of North Carolina, Greensboro Division; filed its answer; and, following discovery, moved for summary judgment. Stroh argued that, according to the undisputed material facts, its decision to withhold consent was not unreasonable, but was made in good faith and for legitimate business reasons.
 
 
 11
 In response, the shareholders filed a motion for partial summary judgment, claiming that Section 5 of the Agreement was ambiguous because it established an objective standard (consent shall not be withheld unreasonably) and a subjective standard (consent may be withheld for good faith business reasons) to govern Stroh's decision whether to approve a proposed control change. Alternatively, the shareholders argued that the two provisions conflicted and that the reasonableness criterion controlled. Because the shareholder's motion for partial summary judgment was directed only at creating an issue of fact in the interpretation of the Agreement, and not at establishing that they were entitled to judgment under their interpretation of it, the district court denied the motion and treated it as a response to Stroh's motion for summary judgment.
 
 
 12
 On the merits, the district court found that the Agreement was not ambiguous and that the apparently conflicting subjective and objective criteria governing consent to a control change could readily be harmonized by reading them to mean that "Stroh's may not unreasonably deny a control change and any such denial must be made in good faith for legitimate business reasons." According to the district court, the "good faith" element allowed Stroh to consider intangible factors in evaluating a potential change in control. The court concluded, however, that "this inescapable element of subjectivity does not imply that such decisions need not be reasonable and for demonstrable business reasons." Interpreting the Agreement in this manner, the district court granted Stroh's motion for summary judgment, reasoning essentially that, based on the undisputed facts, Stroh's decision to withhold consent was neither unreasonable nor taken in bad faith.
 
 
 13
 On this appeal, the shareholders argue that the district court erred in concluding that the Agreement's reasonableness and good faith criteria for evaluating a control change were not ambiguous and that, in any event, material questions of fact existed as to the reasonableness and bona fides of Stroh's decision to withhold consent to the sale of Mark IV to Caffey Distributing. The shareholders do not challenge the denial of their motion for partial summary judgment.
 
 DISCUSSION
 
 14
 We review the district court's grant of summary judgment de novo, and will uphold the decision if we conclude that there is no genuine issue as to any material fact and that Stroh is entitled to judgment as a matter of law. See, e.g., Cohn v. Bond, 953 F.2d 154, 157 (4th Cir. 1991), cert. denied, 112 S. Ct. 3057 (1992); Fed. R. Civ. P. 56(c).
 
 
 15
 The shareholders first contend that Section 5 of the Agreement is ambiguous because it is unclear whether the objective reasonableness or subjective good faith standard governs Stroh's decision to approve a control change. The shareholders argue, for example, that a decision taken in good faith nevertheless can be unreasonable. According to the shareholders, material questions of fact exist concerning the meaning of Section 5 of the Agreement that preclude entry of summary judgment.
 
 
 16
 Whatever merit these arguments may have in another context, the question of whether the Agreement can be deemed ambiguous does not control the outcome of this appeal, because the district court interpreted the Agreement as requiring Stroh to satisfy both standards. See, e.g., Excello Mine Co. v. Monsieur Henri Wines, Ltd., 474 F. Supp. 203, 209 (S.D. Ohio 1979) (finding that issue of whether "good faith" and "just cause" standards were coterminous was "academic" where franchisor satisfied both standards in terminating franchise). Accordingly, the central inquiry on appeal is whether there are genuine issues of material fact regarding the reasonableness or good faith of Stroh's refusal to consent to the Caffey Distributing transaction.
 
 
 17
 As the district court correctly observed, possible dilution of sales when a franchisee sells the products of a competitor can constitute a reasonable basis for terminating, or withholding consent to the transfer of, a franchise. See, e.g., Brattleboro Auto Sales, Inc. v. Subaru of New England, Inc., 633 F.2d 649, 652 (2d Cir. 1980); Simonds Chevrolet, Inc. v. General Motors Corp., 564 F. Supp. 151, 153 (D. Mass. 1983); see also In re Super Premium Ice Cream Distrib. Antitrust Litig., 691 F. Supp. 1262, 1270 (N.D. Cal. 1988), aff'd, 895 F.2d 1417 (9th Cir. 1990) (table). In addition, a franchisee's "antagonistic and truculent attitude" also has been held to constitute, in part, "just cause" to terminate a franchise. Excello, 474 F. Supp. at 210.
 
 
 18
 In the present case, it is undisputed that Caffey Distributing is a high volume Miller distributor. Indeed, while sales of Stroh brands totaled over 80% of Mark IV's business in 1986, this same volume of sales would have amounted to only 25% of Caffey Distributing's business. It is also undisputed that Caffey told Stroh representatives that he was "not begging for Stroh brands"; that he would still make a "million a year" without Stroh brands; that he was "doing Stroh's a favor by taking the distributorship"; and that he did not always cooperate with Miller.
 
 
 19
 We agree with the district court that, based on Caffey Distributing's Miller sales and Mr. Caffey's apparently antagonistic transaction and uncooperative attitude, Stroh had reasonable grounds to fear sales dilution and to withhold its consent to transfer. Moreover, the decision to deny consent to the Caffey Distributing transaction (and to approve the later sale to Lillard) advanced Stroh's consolidation policy. See American Mart Corp. v. Joseph E. Seagram & Sons, Inc., 824 F.2d 733, 734-35 (9th Cir. 1987) (per curiam). Finally, like the district court, we find no evidence in the record suggesting that Stroh's reasons for refusing consent to the control change were pretextual. Cf. Thompson Trading, Ltd. v. Allied Breweries Overseas Trading Ltd., 748 F. Supp. 936, 942 & n.3 (D.R.I. 1990).
 
 
 20
 Accordingly, we hold that Stroh's decision to withhold consent to the proposed control change was neither unreasonable nor taken in bad faith.
 
 CONCLUSION
 
 21
 We have considered appellants' remaining arguments and find them to be without merit. Based on the foregoing, the judgment of the district court is
 
 
 22
 AFFIRMED.
 
 
 
 [1]
 Section 3 of the Agreement provided in relevant part:
 Stroh and Wholesaler agree that critical factors in the successful operation of Wholesaler's business as it relates to Stroh Brands ... are the personal experience, knowledge, ability, dedication, and resources of the Wholesaler's management and owner(s), and their commitment to Wholesaler's Stroh Brands business; and that accordingly this Agreement is a personal service contract. Those factors form the basis for a continuing relationship between Stroh and Wholesaler as well as serve as criteria for consideration of transfers of ownership or control of Wholesaler.
 
 
 [2]
 Section 5 of the Agreement provided in relevant part:
 Stroh will not unreasonably withhold its approval of a proposed Control Change. It is mutually understood and agreed that Stroh is vitally concerned with the cumulative effect of each proposed Control Change on the potential success of both Wholesaler's Stroh Brands business and Stroh's business and accordingly, in making its determination, Stroh will consider competitive factors in the market generally, the experience, knowledge, ability, resources, dedication and proposed operating strategies and plans of the wholesaler organization (including its management and ownership) which will continue Wholesaler's Stroh Brands business after such proposed Control Change. Further, Stroh specifically reserves the right to disapprove any proposed Control Change which Stroh in good faith believes to be adverse to the overall business interests of Stroh in Wholesaler's territory.